BOSTON STOCK EXCHANGE et al. v. STATE TAX
COMMISSION et al.

No. 75–1019. Argued November 2, 1976—Decided January 12, 1977

*Roger Pascal* argued the cause for appellants. With him on the briefs was *Milton H. Cohen.*

*Robert W. Bush,* Assistant Attorney General of New York, argued the cause for appellees. With him on the brief were *Louis J. Lefkowitz,* Attorney General, and *Ruth Kessler Toch,* Solicitor General.

MR. JUSTICE WHITE delivered the opinion of the Court.

In this case we are asked to decide the constitutionality of a recent amendment to New York State's longstanding tax on securities transactions. Since 1905, New York has imposed a tax (transfer tax) on securities transactions, if part of the transaction occurs within the State. In 1968, the state legislature amended the transfer tax statute so that transactions involving an out-of-state sale are now taxed more heavily than most transactions involving a sale within the State. In 1972, appellants, six "regional" stock exchanges located outside New York,[1] filed an action in state court

---

[1] Appellants are the Boston Stock Exchange, Detroit Stock Exchange, Pacific Coast Stock Exchange, Cincinnati Stock Exchange, Midwest Stock Exchange, and the PBW (Philadelphia-Baltimore-Washington) Stock Exchange. The Exchanges provide facilities for their members to effect the purchase and sale of securities for their own accounts and the accounts of their customers.

against the State Tax Commission of New York and its members. The Exchanges' complaint alleged that the 1968 amendment unconstitutionally discriminates against interstate commerce by imposing a greater tax burden on securities transactions involving out-of-state sales than on transactions of the same magnitude involving in-state sales.[2] The State Supreme Court denied the Commission's motion to dismiss the action and the Commission appealed. The Appellate Division reversed and ordered that the Commission's motion be granted to the extent of entering a judgment declaring the 1968 amendment to be constitutional.[3] 45 App. Div.

---

[2] In the courts below the Exchanges also contended that the amendment to the transfer tax was unconstitutional under the Privileges and Immunities Clause of Art. IV, § 2, and the Equal Protection Clause of the Fourteenth Amendment. They have not brought those claims to this Court and we do not address them.

[3] The Commission's motion to dismiss was based on three grounds: (1) the state court lacked subject-matter jurisdiction, (2) the Exchanges did not have standing to question the constitutionality of the statute, and (3) the complaint failed to state a cause of action. All three state courts agreed that there was jurisdiction and standing, but the Appellate Division and the Court of Appeals dismissed the complaint on the merits because the statute was constitutional.

We agree, of course, that state courts of general jurisdiction have the power to decide cases involving federal constitutional rights where, as here, neither the Constitution nor statute withdraws such jurisdiction. We also agree that the Exchanges have standing under the two-part test of *Data Processing Service* v. *Camp*, 397 U. S. 150 (1970). Appellants' complaint alleged that a substantial portion of the transactions on their exchanges involved securities that are subject to the New York transfer tax, and that the higher tax on out-of-state sales of such securities diverted business from their facilities to exchanges in New York. This diversion was the express purpose of the challenged statute. See *infra*, at 325–328, and nn. 7, 10. The allegation establishes that the statute has caused them "injury in fact," and that a case or controversy exists. 397 U. S., at 151–152. The Exchanges are asserting their right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes on their business and they allege that the transfer tax indirectly infringes on that right. Thus, they are "arguably within the

2d 365, 357 N. Y. S. 2d 116 (1974). The New York Court of Appeals affirmed the order, 37 N. Y. 2d 535, 337 N. E. 2d 758 (1975), and we noted probable jurisdiction of the Exchanges' appeal, 424 U. S. 964 (1976).

## I

New York Tax Law § 270.1 (McKinney 1966) provides that "all sales, or agreements to sell, or memoranda of sales and all deliveries or transfers of shares or certificates of stock" in any foreign or domestic corporation are subject to the transfer tax.[4] Administrative regulations promulgated with respect to

---

zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Id.*, at 153. Moreover, the Exchanges brought this action also on behalf of their members. "[A]n association may have standing solely as the representative of its members . . . [if it] allege[s] that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth* v. *Seldin*, 422 U. S. 490, 511 (1975). See also *National Motor Freight Assn.* v. *United States*, 372 U. S. 246 (1963); *NAACP* v. *Alabama*, 357 U. S. 449, 458–460 (1958). The Exchanges' complaint alleged that their members traded on their own accounts in securities subject to the New York transfer tax. The members therefore suffer an actual injury within the zone of interests protected by the Commerce Clause, and the Exchanges satisfy the requirements for representational standing.

[4] After the decision by the New York Court of Appeals in this case, § 21 (2)(d) of the Federal Securities Acts Amendments of 1975 became effective. This amendment provides that no State may tax a change in beneficial or record ownership of securities if the change is effected through the facilities of a registered clearing house or registered transfer agent unless the change would otherwise be taxable if the facilities were not physically located in the taxing State. § 21 (2)(d), 89 Stat. 161, amending § 28 of the Securities Exchange Act of 1934, 15 U. S. C. § 78bb (d) (1970 ed., Supp. V). A transfer agent is defined in § 3 (6) of the 1975 amendments, 89 Stat. 100, amending § 3 (a) of the Securities Exchange Act of 1934, 15 U. S. C. § 78c (a)(25) (1970 ed., Supp. V). Although the Senate Committee was unclear as to whether the New York transfer tax reached such changes in ownership, the Senate Report on the 1975 amendments indicates that § 21 (2)(d) was directed to New York's

the transfer tax provide that the tax applies if any one of the five taxable events occurs within New York, regardless of where the rest of the transaction takes place, and that if more than one taxable event occurs in the State, only one tax is payable on the entire transaction. 20 N. Y. C. R. R. 440.2 (1976). For transactions involving sales, the rate of tax depends on the selling price per share and the total tax liability is determined by the number of shares sold.[5] N. Y. Tax Law § 270.2 (McKinney 1966). Thus, under the unamended version of § 270, a transaction involving a sale and a transfer of shares in New York was taxed the same as a transaction involving an in-state transfer but an out-of-state sale. In both instances, the occasion for the tax was the occurrence of at least one taxable event in the State, the rate of tax was

---

transfer tax in particular, and in general to similar taxes being considered by other States. S. Rep. No. 94–75, p. 60 (1975). See N. Y. Tax Law § 270.5(i)–(l) (McKinney Supp. 1976).

On December 1, 1975, counsel for the New York State Department of Taxation and Finance issued an opinion that the 1975 amendments limited the types of taxable events covered by § 270:

"[W]here the sole event in New York State is the delivery or transfer to or by a 'registered clearing agency' or a 'registered transfer agent,' as those terms are defined under the Securities Exchange Act of 1934, there is no stock transfer tax due and owing on and after December 1, 1975. However, where a sale, agreement to sell, memorandum of sale or any other delivery or transfer takes place in New York State, the stock transfer tax due and owing thereon must be paid." 2 CCH N. Y. Tax Rep. ¶ 57–101.605 (1976).

Although the new federal law may eliminate many transactions as taxable events under § 270, the constitutional questions raised by the Exchanges on this appeal still apply to the transactions that are taxable under § 270 after the 1975 amendments.

[5] The rates provided for in § 270.2 range from 1.25 cents per share when the sale price of the security is less than $5 to the highest rate of 5 cents per share when the price is $20 or more. When no sale is involved, e. g., a gift, the rate is a constant 2.5 cents per share. In recent years, a 25% surcharge has been added to all transfer taxes. N. Y. Tax Law § 270–d (McKinney Supp. 1976).

based solely on the price of the securities, and the total tax was determined by the number of shares sold. The Exchanges do not challenge the constitutionality of § 270.[6]

None of the States in which the appellant Exchanges are located taxes the sale or transfer of securities. During the 1960's the New York Stock Exchange became concerned that the New York transfer tax created a competitive disadvantage for New York trading and was thus responsible for the growth of out-of-state exchanges.[7] In response to

[6] Shortly after it was first enacted, the New York transfer tax was upheld against a challenge under the Fourteenth Amendment in *New York ex rel. Hatch* v. *Reardon,* 204 U. S. 152 (1907). The writ of error in *Hatch* did not challenge the constitutionality of the statute under the Commerce Clause, but both parties argued that issue before the Court. *Id.,* at 157. In response to those arguments, Mr. Justice Holmes observed only that the particular transaction involved was intrastate and that therefore the tax as applied to the party before the Court did not implicate the Commerce Clause. *Id.,* at 161–162. As to the question of whether the statute should fall because it would also be applied to interstate transactions, the Court found that the seller lacked standing to raise that claim. The Commerce Clause question was thus left undecided. *Id.,* at 160–161.

Thirty-three years later, the New York Court of Appeals held, in a 4–3 decision, that the transfer tax did not violate the Commerce Clause. *O'Kane* v. *State,* 283 N. Y. 439, 28 N. E. 2d 905 (1940). The challenge there was to a tax levy "upon an agreement for the sale of shares of stock which are to be sold and delivered across State lines." *Id.,* at 442, 28 N. E. 2d, at 906. The state court expressly noted that the tax, as then applied, was "a non-discriminatory State tax," and that "no discrimination was practiced on interstate commerce." *Id.,* at 444, 447, 28 N. E. 2d, at 907, 909. In the absence of discrimination, the tax was held not to be an undue burden on commerce.

[7] In a public statement on the proposed amendment to § 270, the president of the New York Stock Exchange explained the competitive problems of his organization and urged that the transfer tax be amended to help solve them:

"[T]he stock transfer tax has been the subject of extensive study by the City, State and the securities industry. These studies indicate that the New York securities markets have experienced increasing competitive

this concern and fearful that the New York Stock Exchange would relocate outside New York, the legislature in 1968 enacted § 270–a to amend the transfer tax by providing for two deviations from the uniform application of § 270 when one of the taxable events, a sale, takes place in New York. First, transactions by nonresidents of New York are afforded a 50% reduction ("nonresident reduction") in the rate of tax when the transaction involves an in-state sale. Taxable transactions by residents (regardless of where the sale is made) [8] and by nonresidents selling outside the State do not benefit from the rate decrease. Second, § 270–a limits the total tax liability of any taxpayer (resident or nonresident) to $350 (maximum tax) for a single transaction when it involves a New York sale. If a sale is made out-of-State,

---

problems in recent years from regional stock exchanges located in San Francisco, Los Angeles, Chicago, Detroit, Philadelphia and Boston. Some 88% of share trading on these exchanges is in New York Stock Exchange listed securities.

"From 1965 through 1967, the volume of trading on the regional exchanges increased by 73.2%. Regional 'cross' volume (a transaction on a regional exchange in which the broker finds both the buyer and seller) has increased by 202% in 1965–67. This indicates the loss of business by the New York markets to the regionals. As their volume continues to grow, a snowball effect develops. They become more competitive and are able to take more and more business away from New York. A loss of business to New York securities markets also means a loss of stock transfer tax revenue to New York City.

". . . However, the existing law can be amended in such a way as to ease the competitive disadvantage of the tax on New York securities markets and still preserve the revenue from the tax.

"Competitive problems are particularly acute in two areas—non-resident investors and large block transactions." Statement of Robert W. Haack, Mar. 4, 1968.

[8] The Exchanges do not challenge New York's authority to tax residents in a greater amount than nonresidents as long as the extent of the tax burden does not depend on an out-of-state sale.

the § 270 tax rate applies to an in-state transfer (or other taxable event) without limitation.[9]

The reason for the enactment of § 270–a and the intended

___

[9] The nonresident reduction and the maximum tax of § 270–a initially involved a smaller disparity between in-state and out-of-state sales. The gap was gradually increased until the current rates took effect on July 1, 1973.

The relevant provisions of N. Y. Tax Law § 270–a (McKinney Supp. 1976) are as follows:

"1. Notwithstanding the provisions of section two hundred seventy of this chapter on and after July first, nineteen hundred sixty-nine, the rates of tax set forth in paragraph (a) of this subdivision and the maximum amounts of tax set forth in subdivision two of this section shall apply, in the case of those sales made within this state subject to tax under section two hundred seventy and described in paragraph (a) of this subdivision and subdivision two of this section.

"(a) On such sales by a nonresident during the periods set forth in the following table, the rates of tax shall be the percentages, set forth in such table, of the rates of tax provided in section two hundred seventy of this article:

| "Period | "Percentage of Rates of Tax Provided in Section two hundred seventy of this article |
|---|---|
| "July 1, 1969 to June 30, 1970 | 95% |
| "July 1, 1970 to June 30, 1971 | 90% |
| "July 1, 1971 to June 30, 1972 | 80% |
| "July 1, 1972 to June 30, 1973 | 65% |
| "July 1, 1973 and thereafter | 50% |

. . . . .

"2. Where any sale made within the state and subject to the tax imposed by this chapter relates to shares or certificates of the same class and issued by the same issuer the amount of tax upon any such single taxable sale shall not exceed, during the period beginning on July first, nineteen hundred sixty-nine and ending on June thirtieth, nineteen hun-

effect of the amendment are clear from the legislative history. With respect to the amendment, the legislature found:

"The securities industry, and particularly the stock exchanges located within the state have contributed importantly to the economy of the state and its recognition as the financial center of the world. The growth of exchanges in other regions of the country and the diversion of business to those exchanges of individuals who are nonresidents of the state of New York, requires recognition that the tax on transfers of stock imposed by article twelve of the tax law, is an important contributing element to the diversion of sales to other areas to the detriment of the economy of the state. Furthermore, in the case of transactions involving large blocks of stock, recognition must be given to the ease of completion

dred seventy, the sum of two thousand five hundred dollars; during the period beginning on July first, nineteen hundred seventy and ending on June thirtieth, nineteen hundred seventy-one, the sum of one thousand two hundred fifty dollars; during the period beginning on July first, nineteen hundred seventy-one and ending on June thirtieth, nineteen hundred seventy-two, the sum of seven hundred fifty dollars; during the period beginning on July first, nineteen hundred seventy-two and ending on June thirtieth, nineteen hundred seventy-three, the sum of five hundred dollars; and on and after July first, nineteen hundred seventy-three, the sum of three hundred fifty dollars; provided, however, that sales made within this state by any member of a securities exchange or by any registered dealer, who is permitted or required pursuant to any rules and regulations promulgated by the tax commission pursuant to the provisions of section two hundred eighty-one-a of this chapter to pay the taxes imposed by this article without the use of the stamps prescribed by this article, pursuant to one or more orders placed with the same member of a securities exchange or the same registered dealer on one day, by the same person, each relating to shares or certificates of the same class and issued by the same issuer, all of which sales are executed on the same day (regardless of whether it be the day of the placing of the orders), shall, for the purposes of this subdivision two, be considered to constitute a single taxable sale."

of such sales outside the state of New York without the payment of any tax. In order to encourage the effecting by nonresidents of the state of New York of their sales within the state of New York and the retention within the state of New York of sales involving large blocks of stock, a separate classification of the tax on sales by nonresidents of the state of New York and a maximum tax for certain large block sales are desirable." 1968 N. Y. Laws, c. 827, § 1.

In granting executive approval to § 270–a, then Governor Nelson Rockefeller confirmed that the purpose of the new law was to "provide long-term relief from some of the competitive pressures from outside the State." [10] The Gov-

---

[10] In his memorandum of approval of the transfer tax amendment, Governor Rockefeller explained the changing competitive patterns in the securities industry and acknowledged that § 270–a was a response to these changes:

"Since the stock transfer tax was enacted in 1905, there have been far reaching changes in the securities industry, but the stock transfer tax has not been revised to keep pace with those changes. The securities industry has grown from an essentially New York industry to one of national and international scope. While the bulk of stock transfers still funnels through New York, only twelve percent of the Nation's investors are located in the State. At the same time, competition for the New York markets has been heightened by the rise of regional stock exchanges located outside the State where more than 90 percent of trading is in securities listed on the New York Stock Exchange. The development of modern telecommunications and electronic computer systems has, of course, greatly expanded the capacity of the regional exchanges to challenge the New York exchanges for business.

"The bill recognizes the changing character of the securities industry and the importance of its continued presence and strength for the future economic prosperity of the State and will provide long-term relief from some of the competitive pressures from outside the State.

"As a result of adoption of the revisions of the stock transfer tax contained in this bill, the New York Stock Exchange has announced that it intends to remain and expand in New York and is now studying sites for

ernor announced that as a result of the transfer tax amendment the New York Stock Exchange intended to remain in New York.

Appellant Exchanges contend that the legislative history states explicitly what is implicit in the operation of § 270–a: The amendment imposes an unequal tax burden on out-of-state sales in order to protect an in-state business. They argue that this discrimination is impermissible under the Commerce Clause. Appellees do not dispute the statements of the legislature and the Governor that § 270–a is a measure to reduce out-of-state competition with an in-state business. They agree, however, with the holding of the Court of Appeals that the legislature has chosen a nondiscriminatory, and therefore constitutionally permissible, means of "encouraging" sales on the New York Stock Exchange. We hold that § 270–a discriminates against interstate commerce in violation of the Commerce Clause.

## II

As in *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366 (1976), we begin with the principle that "[t]he very purpose of the Commerce Clause was to create an area of free trade among the several States." *McLeod* v. *J. E. Dilworth Co.,* 322 U. S. 327, 330 (1944). It is now established beyond dispute that "the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. . . . [T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States." *Freeman* v. *Hewit,* 329 U. S. 249, 252 (1946). The Commerce Clause does not, however, eclipse the reserved "power of the States to tax for the support of their own governments," *Gib-*

---

a new exchange building in downtown Manhattan." Public Papers of Governor Nelson A. Rockefeller 553 (1968).

*bons* v. *Ogden,* 9 Wheat. 1, 199 (1824), or for other purposes, cf. *United States* v. *Sanchez,* 340 U. S. 42, 44–45 (1950); rather, the Clause is a limit on state power. Defining that limit has been the continuing task of this Court.

On various occasions when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. *E. g., Freeman* v. *Hewit, supra,* at 252. This case-by-case approach has left "much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 457 (1959). Nevertheless, as observed by Mr. Justice Clark in the case just cited: "[F]rom the quagmire there emerge . . . some firm peaks of decision which remain unquestioned." *Id.,* at 458. Among these is the fundamental principle that we find dispositive of the case now before us: No State, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." *Ibid.* See also *Halliburton Oil Well Co.* v. *Reily,* 373 U. S. 64 (1963); *Nippert* v. *Richmond,* 327 U. S. 416 (1946); *I. M. Darnell & Son* v. *Memphis,* 208 U. S. 113 (1908); *Guy* v. *Baltimore,* 100 U. S. 434, 443 (1880); *Welton* v. *Missouri,* 91 U. S. 275 (1876). The prohibition against discriminatory treatment of interstate commerce follows inexorably from the basic purpose of the Clause. Permitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses "would invite a multiplication of preferential trade areas destructive" of the free trade which the Clause protects. *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951).

Although apparently accepting the teaching of the prior

cases, the Court of Appeals seemed to view § 270–a as "compensatory legislation" enacted to "neutralize" the competitive advantage § 270 conferred on stock exchanges outside New York. Thus, it analogized the New York statute to state use taxes which have survived Commerce Clause challenges. 37 N. Y. 2d, at 542, 337 N. E. 2d, at 762. The statute will not support this characterization.

Prior to the 1968 amendment, the New York transfer tax was neutral as to in-state and out-of-state sales. An in-state transfer or delivery of securities triggered the tax and the burden fell equally on all transactions regardless of the situs of sale. Thus, the choice of an exchange for the sale of securities that would be transferred or delivered in New York was not influenced by the transfer tax; wherever the sale was made, tax liability would arise. The flow of interstate commerce in securities was channeled neither into nor out of New York by the state tax.[11]

Section 270–a upset this equilibrium. After the amendment took effect, a nonresident contemplating the sale of securities that would be delivered or transferred in New York faced two possible tax burdens. If he elected to sell on an out-of-state exchange, the higher rates of § 270 applied without limitation on the total tax liability; if he sold the securities on a New York exchange, the one-half rate of § 270–a

---

[11] Of course, the unamended § 270 did discourage sales in New York when no other taxable event would occur in that State, since out-of-state sales would not be taxed at all while in-state sales would be taxed at the full rate. Section 270–a, however, does not neutralize this competitive disadvantage of the New York exchanges. Although the reduced tax of the amendment decreases the disincentive to trade out of State, to the extent that any tax is imposed on transactions involving only an in-state sale, sales in New York are discouraged. Had New York sought to eliminate the only competitive edge enjoyed by the regional exchanges as a result of § 270, it could have done so without burdening commerce to its sister States by simply declaring that sales would not be a taxable event. Under that system, sellers who would not otherwise be liable for the tax would not incur liability by electing to sell on a New York exchange.

applied and then only up to a $350 tax liability. Similarly, residents engaging in large block transactions on the New York exchanges were subject to a maximum tax levy of $350; but if they sold out-of-State, their tax bill would be limited only by the number of shares sold. Thus, under § 270–a the choice of exchange by all nonresidents and by residents engaging in large transactions is not made solely on the basis of nontax criteria. Because of the delivery or transfer in New York, the seller cannot escape tax liability by selling out of State, but he can substantially reduce his liability by selling in State. The obvious effect of the tax is to extend a financial advantage to sales on the New York exchanges at the expense of the regional exchanges. Rather than "compensating" New York for a supposed competitive disadvantage resulting from § 270, the amendment forecloses tax-neutral decisions and creates both an advantage for the exchanges in New York and a discriminatory burden on commerce to its sister States.

Equal treatment of interstate commerce, lacking in § 270–a, has been the common theme running through the cases in which this Court has sustained "compensating," state use taxes. In *Henneford* v. *Silas Mason Co.,* 300 U. S. 577 (1937), Washington imposed a 2% sales tax on all goods sold at retail in the State. Since the sales tax would have the effect of encouraging residents to purchase at out-of-state stores, Washington also imposed a 2% "compensating tax" on the use of goods within the State. The use tax did not apply, however, when the article had already been subjected to a tax equal to or greater than 2%. The effect of this constitutional tax system was nondiscriminatory treatment of in-state and out-of-state purchases:

> "Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington. It exists when the imported chattel is shipped from the state of origin under an order re-

ceived directly from the state of destination. In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local." *Id.*, at 584.

A similar use-sales-tax structure was sustained in *General Trading Co.* v. *Tax Comm'n*, 322 U. S. 335 (1944), because the "tax [was] what it professes to be—a nondiscriminatory excise laid on all personal property" regardless of where the sale was made. *Id.*, at 338. See also *International Harvester Co.* v. *Department of Treasury*, 322 U. S. 340 (1944); *Alaska* v. *Arctic Maid*, 366 U. S. 199, 204 (1961). In all the use tax cases, an individual faced with the choice of an in-state or out-of-state purchase could make that choice without regard to the tax consequences. If he purchased in State, he paid a sales tax; if he purchased out of State but carried the article back for use in State, he paid a use tax of the same amount. The taxes treated both transactions in the same manner.

Because it imposes a greater tax liability on out-of-state sales than on in-state sales, the New York transfer tax, as amended by § 270–a, falls short of the substantially even-handed treatment demanded by the Commerce Clause. The extra tax burden on out-of-state sales created by § 270–a is not what the New York Court of Appeals holds it out to be; it neither compensates for a like burden on in-state sales, nor neutralizes an economic advantage previously enjoyed by the appellant Exchanges because of § 270.[12]

---

[12] Because of the discrimination inherent in § 270–a, we also reject the Commission's argument that the tax should be sustained because it is imposed on a local event at the end of interstate commerce. While it is true that, absent an undue burden on interstate commerce, the Commerce Clause does not prohibit the States from taxing the transfer of property within the State, the tax may not discriminate between transactions on the basis of some interstate element. *International Harvester Co.* v. *Department of Treasury*, 322 U. S. 340, 347–348 (1944). As was held in *Welton* v. *Missouri*, 91 U. S. 275, 282 (1876): "[T]he commercial power

## III

The court below further attempted to save § 270–a from invalidation under the Commerce Clause by finding that the effect the amendment might have on sales by residents and nonresidents did not amount to unconstitutional discrimination. As to New York residents, the court found that the higher tax on large out-of-state sales would have no "practical" effect since "it is more than likely . . . that the sale would be made on a New York exchange in any event." 37 N. Y. 2d, at 543, 337 N. E. 2d, at 762. As to the discriminatory tax burden on all out-of-state sales by nonresidents, the court observed that because New York sales by nonresidents also involve interstate commerce, § 270–a does not discriminate against interstate commerce in favor of intrastate commerce; rather, it discriminates between two kinds of interstate transactions. *Ibid.* Although it did not so state, the Court of Appeals apparently believed that such discrimination was permissible under the Commerce Clause. We disagree with the Court of Appeals with respect to both residents and nonresidents.

The maximum tax discrimination against out-of-state sales by residents is not triggered until the taxed transaction involves a substantial number of shares. Investors, institutional and individual, engaging in such large-block transactions can be expected to choose an exchange on the basis of services, prices, and other market conditions rather than geographical proximity. Even a small difference in price (of either the securities or the sales services) can, in a large sale, provide a substantial enough additional profit to outweigh whatever additional transaction costs might be incurred from trading on an out-of-state exchange. The New York Leg-

---

[of the Federal Government] continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin."

islature, in its legislative findings in connection with § 270–a, recognized that securities transactions by residents were not being conducted only on the New York exchanges; it therefore considered the amendment necessary to "[retain] within the state of New York . . . sales involving large blocks of stock." If, as the Court of Appeals assumed, it were "more than likely" that residents would sell in New York, there would have been no reason for the legislature to reduce the tax burden on in-state sales by residents in order to retain their sales in New York. Nor is the discriminatory burden of the maximum tax insubstantial. On a transaction of 30,000 shares selling at $20 or more, for example, the tax on an in-state sale is the maximum $350, while an out-of-state sale is taxed $1,500. The disparity between the two taxes increases with the number of shares sold. Such a large tax penalty for trading on out-of-state markets cannot be deemed to have no practical effect on interstate commerce.[13]

Both the maximum tax and the rate reduction provisions of § 270–a discriminate against out-of-state sales by non-residents. The fact that this discrimination is in favor of nonresident, in-state sales which may also be considered as interstate commerce, see *Freeman* v. *Hewit,* 329 U. S., at 258–259, does not save § 270–a from the restrictions of the Commerce Clause. A State may no more use discriminatory taxes to assure that nonresidents direct their commerce to businesses

---

[13] Even if we did not conclude that large-block sellers are likely to rely on economic rather than geographical factors in choosing an exchange, § 270–a would fall before the Commerce Clause. Whatever the current inclinations of New York investors, the Clause protects out-of-state businesses from any discriminatory burden on their interstate commercial activities. Even if the tax is not now the sole cause of New York residents' refusal to trade on out-of-state exchanges, at the very least it reinforces their choice of an in-state exchange and is an inhibiting force to selling out of State; that inhibition is an unconstitutional barrier to the free flow of commerce.

within the State than to assure that residents trade only in intrastate commerce. As we stated at the outset, the fundamental purpose of the Clause is to assure that there be free trade among the several States. This free trade purpose is not confined to the freedom to trade with only one State; it is a freedom to trade with any State, to engage in commerce across all state boundaries.

There has been no prior occasion expressly to address the question whether a State may tax in a manner that discriminates between two types of interstate transactions in order to favor local commercial interests over out-of-state businesses, but the clear import of our Commerce Clause cases is that such discrimination is constitutionally impermissible. *Guy* v. *Baltimore*, 100 U. S., at 443, held that no State, consistent with the Commerce Clause, may "build up its domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States"; and in *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), New York was prohibited from regulating the price of out-of-state milk purchases because the effect of that regulation would be "to suppress or mitigate the consequences of competition between the states." *Id.*, at 522.[14] More recently, we noted that

---

[14] *Baldwin* is particularly relevant to this case. After holding that the Commerce Clause prohibits obstructions to competition between the States, Mr. Justice Cardozo expressly rejected the proposition that such obstructions may be justified as measures to assure the economic health of local industry:

"If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation.

.        .        .        .        .

"The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in

this "Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal." *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 145 (1970). Cf. *Halliburton Oil Well Co.* v. *Reily*, 373 U. S., at 72–73.

Although the statutes at issue in those cases had the primary effect of prohibiting or discriminatorily burdening a resident's purchase of out-of-state goods and services, the constitutional policy of free trade and competition that led to their demise is equally fatal to the New York transfer tax. New York's discriminatory treatment of out-of-state sales is made possible only because some other taxable event (transfer, delivery, or agreement to sell) takes place in the State. Thus, the State is using its power to tax an in-state operation as a means of "requiring [other] business operations to be performed in the home State." As a consequence, the flow of securities sales is diverted from the most economically efficient channels and directed to New York. This diversion of interstate commerce and diminution of free competition in securities sales are wholly inconsistent with the free trade purpose of the Commerce Clause.

## IV

Our decision today does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other States for a share

---

the long run prosperity and salvation are in union and not division." 294 U. S., at 522–523.

For the same reasons that *Baldwin* rejected New York's attempts to protect its dairy industry from competition from without, we now reject a similar attempt to protect New York's securities industry.

of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.

The judgment of the New York Court of Appeals is reversed, and the case remanded for further proceedings not inconsistent with this opinion.[15]

*It is so ordered.*

---

[15] When it enacted § 270–a, the New York Legislature also enacted a saving provision such that the invalidity of any part of the amendment should not affect the enforcement of any other part. It is not clear from the saving provision whether the legislature intended that the distinction between residents and nonresidents should survive the invalidation of the discrimination between in-state and out-of-state sales. Compare 1968 N. Y. Laws, c. 827, § 10 with § 11. Construction of the saving clause is, of course, a question of state law appropriately decided by the state courts.