OPINION OF THE COURT
Fuchsberg, J.
On this appeal, here directly pursuant to CPLR 5601 (subd [b], par 2), we are called upon to determine whether subdivision 1 of section 654 of our Insurance Law, in imposing a so-called "capping” impost based on the total net worth of property and casualty insurance corporations, offends the due process clauses of our Federal and State Constitutions. The appellants are seven large foreign corporations who write such insurance in the various States, including New York.
The challenged provision is an amendment to a statutory scheme under which the Insurance Law creates a joint underwriting group, the New York Property Insurance Underwriting Association, for the purpose of making fire and extended coverage[1] available to persons who otherwise would be unable to obtain adequate protection in the private insurance market. (See Brueckner v Superintendent of Ins. of State of N. Y., 39 AD2d 383, 385, affd 33 NY2d 663; NY Legis Ann, 1968, pp 313, 461.) As a condition to transacting business in the State every insurer authorized to write policies in this field is required to join the association. The pool they finance operates under the name Fair Access to Insurance Requirements or, as more popularly referred to in the industry, under the acronym FAIR. In essence, as the plan was set up under the original legislation in 1968, its members were to share in FAIR’S profits and losses in the proportion that each one’s net direct premiums on policies written in New York bore to the aggregate net direct premiums written in this State by all members of the association (Insurance Law, § 651, subd 7; § 654, subd 1).
However, by a 1971 amendment to subdivision 1 of section 654, the change that is at the heart of this appeal was wrought. While the proportional form of financing of FAIR was continued, each insurer’s liability for losses sustained by the program was maximized at 1% of the insurer’s "surplus to policyholders”, which, for all practical purposes, may be *621 equated with net worth.[2] Since, so long as the contributions of all the participating insurers remained strictly proportional, this limitation could be expected to leave a deficit, the amended statute compelled those insurers whose contributions had not yet reached the 1% "cap” to shoulder the additional cost on a proportional basis.[3]
This, of course, introduced a means test. Unlike the basic assessment computed on each insurer’s pro rata premium writing, the "capping” provision made larger companies, i.e., those having a greater net worth, pay more. As the Superintendent of Insurance readily concedes, the legislative intent animating the "capping” provision was solely one to protect small, local insurance companies from suffering the risk of having to share, as they formerly had, in increasingly large losses.
As the financial impact of the "capping” provision began to be felt, the plaintiffs brought this suit to declare the "capping” provision unconstitutional and to enjoin its enforcement. In quest of this relief, they relied on three theories, each pleaded in a separate cause of action. The first, grounded on due process, specifically alleged that the effect of the "cap” was to impose a tax on property beyond the jurisdiction of New York. The second put forth the claim that due process also was *622 implicated by what it characterized as the irrational, arbitrary and confiscatory nature of the statute. Finally, plaintiffs charged that, by reason of irrational discrimination against insurance companies similarly situated, there had been a denial of equal protection. As the litigation progressed, the parties cross-moved for summary judgment, plaintiffs on the first cause of action alone and the superintendent for dismissal of the entire complaint. Special Term, in granting the cross motion, briefly noted that the plaintiffs had failed to overcome the presumption of constitutionality and that the "capping” provision was "not a tax but a proper exercise of regulatory authority over the insurance industry”. For the ensuing reasons, we now reverse, concluding that summary judgment should have been granted on plaintiffs’ first cause of action.[4]
Preliminarily, we address the superintendent’s contention that the "capping” provision is nothing more than an incident of the police power to regulate the insurance industry (see Health Ins. Assn. of Amer. v Harnett, 44 NY2d 302, 306) and that its effect is not to levy a tax but merely to impose charges in the nature of license fees as a condition of doing business in the State. The exaction cannot be a tax, the defendant asserts, because the generation of revenue is not its primary purpose.
But, in so saying, the superintendent makes no mention of the fact that a license fee must be reasonably related to the cost of a licensing program (see Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d 613, 619). This omission appears to be unavoidable. For, the "capping” funds bear not even a rough correlation to the expense to which the State is put in administering its licensing procedures or to the benefits those who make the payments receive, but are applied to the substantive funding of the FAIR plan. Moreover, the plan owes its existence to a felt need to provide the assurance that the designated coverage will continue to be available to all members of the general public who resort to the pool. It is significant too that the obligation to make the "capping” payments was not imposed by an administrative agency *623 charged with regulating licensees, but by the Legislature, the body vested with the power to tax.
Nor is the exaction any less a general revenue-raising measure because it is allocable to a particular project and its amount dependent on the size of the subsidy necessary to sustain the financial soundness of the project it supports. When all is said and done, it is a compulsory contribution for the purpose of defraying the cost of government (Matter of Hanson v Griffiths, 204 Misc 736, 738, affd 283 App Div 662; Houck v Little Riv. Dist., 239 US 254, 265).
Almost needless to add, particularly in the context of a due process attack on a money-producing measure, to allow how it is labeled to determine whether it is a tax or a fee would be to let form obscure substance (see Wisconsin v J. C. Penney Co., 311 US 435, 443). Thus, an employer’s contribution to an unemployment insurance fund, though otherwise denominated, was held to be a tax (see Chamberlin, Inc. v Andrews, 271 NY 1; Great Lakes Co. v Huffman, 319 US 293). And, more closely gaited to the mandatory payments in the present case, a "fee” for the privilege of doing local business, when levied on a stated percentage of a corporation’s capital stock, also was deemed a tax (Western Union Tel. Co. v Kansas, 216 US 1).
Turning then to the constitutional claim, it is fundamental to due process jurisprudence that the taxing power of a State may not extend to tangible or intangible property having no connection or relationship to the taxing State (Louisville & Jeffersonville Ferry Co. v Kentucky, 188 US 385, 398; see Matter of Eastman Kodak Co. v State Tax Comm., 33 AD2d 298, 303, affd 30 NY2d 558). In other words, the due process clause operates to restrain the State from "fixing its tax talons on extra-territorial values” (Hartman, State Taxation of Interstate Commerce: A Survey and an Appraisal, 46 Va L Rev 1051, 1059). To avoid this effect, when a State does venture to apply such a tax, it must be one that, in operation, bears some relation to the protections, opportunities and benefits which the State affords the taxpayer. Our initial inquiry, directed to ascertaining whether such a nexus exists, therefore must be "whether the state has given anything for which it can ask return” (emphasis mine; Wisconsin v J. C. Penney Co., 311 US 435, 444, supra; Norfolk & Western Ry. Co. v Tax Comm., 390 US 317, 325; see Tribe, American Constitutional Law, p 353). For this purpose, it is generally *624 enough if an out-of-State corporation avails itself of the privilege of transacting business within the State (Exxon Corp. v Department of Revenue of Wis., 447 US 207, —, 48 USLW 4687, 4691).
Since this threshold presents no obstacle here, we move on to the next hurdle. At that point, due process poses the further question whether the application of the tax, in this instance to the net worth of foreign insurers doing business here, may be said to be rationally related to property values connected with the taxing State (see Moorman Mfg. Co. v Bair, 437 US 267, 273).[5]
[6] This standard is not satisfied by the excellence of the goals for which the moneys are raised nor, as here, the simple logic of the means chosen to obtain them. Even the clearest intent that those affected be treated equitably will not do. The test is purely pragmatic. It demands fairness, not so much in form as in fact. Precision may not be possible, and in the end, if the State’s taxing power is not to be projected into alien territory, if there is not to be an inequitable and perhaps ruinously overlapping scramble for the national company’s tax dollar, the tax must reflect an economic balance between what the State appropriately may tax and what it may not (Ott v Mississippi Barge Line, 336 US 169, 174; see Matter of Federated Dept. Stores v Gerosa, 16 NY2d 320, 324).
Thus, in Western Union Tel. Co. v Kansas (216 US 1, supra), a case which in principle may most closely approximate the one now before us, the Supreme Court struck down a State statute requiring the telegraph company to pay into a permanent school fund a given percentage of its authorized capital as a condition for doing business in the State. The court, speaking through Justice Harlan, had no trouble finding that, though called a charter fee, in truth this was a tax *625 which contravened both the commerce and due process clauses because "[the] fee, plainly, is not based on such of the company’s capital stock as is represented in its local business and property in Kansas. The requirement is a given per cent of the company’s authorized capital, that is, all its capital, wherever or however employed, whether in the United States or in foreign countries, and whatever may be the extent of its lines in Kansas as compared with its lines outside of that State. * * * It strikes at the company’s entire business wherever conducted and its property wherever located” (216 US, at p 30).
Similarly, on a like rationale, other State franchise taxes which did not attempt any apportionment between intrastate and interstate values consistently have been invalidated (e.g., Cudahy Co. v Hinkle, 278 US 460, 466 [tax on authorized capital stock]; International Paper Co. v Massachusetts, 246 US 135, 141-142 [tax on authorized capital stock]; Looney v Crane Co., 245 US 178 [tax on outstanding capital and surplus]). In none of these cases was the taxing formula designed to work any proportioning of the taxpayer’s business activity and property in the State vis-á-vis that carried on beyond its borders.
But all this does not mean that the Constitution insists that a State, when making its calculation, blind itself to the more amorphous, but nonetheless highly valued, attributes which may be inherent in the transaction of business on a multistate scale. Since fair apportionment is by no means a mechanical function, for whatever it is worth in a suitable case, a State may take cognizance of the fact that what otherwise would have been the more limited value of a particular corporate presence within the State has been enhanced by the special favors that flow from its interstate activity and the national repute that has followed in its wake. For instance, intangible qualitative and quantitative factors, such as the "going-concern value” or the competitive advantage which may result from the "unitary” nature of a broad-based network of production, transportation, marketing and financing facilities, may add a dimension augmenting the value of the intrastate business of such an enterprise (see Exxon Corp. v Department of Revenue of Wis., 447 US 207, —, 48 USLW 4687, 4691, supra).
Moreover, the special contribution that New York, as the economic capital of the Nation, may make in terms of afford *626 ing particular facilities to corporate "showcase” units is not a factor which at all odds must be ignored. This is not to suggest that intrastate companies may receive preferential treatment. Fairness implies relative equality to the extent that it is reasonably possible to achieve it. It does not imply that significant, albeit individualistic, factors, whoever gains or loses thereby, are ruled out as elements of a taxing formula. Supported by appropriate evaluative methods, due process does not deny their validity (see Wallace v Hines, 253 US 66, 69; Atlantic & Pacific Tea Co. v Grosjean, 301 US 412; Norfolk & Western Ry. Co. v Tax Comm., supra, at pp 323-324).[6]
For these reasons, a taxing State need not forebear from employing criteria which include indices of worth as wide-ranging as capital stock or over-all gross receipts, so long as these measures enter into the computation by which the justly apportioned value of the taxpayer’s activity within the State is reached. (See, e.g., Harvester Co. v Evatt, 329 US 416, 419-421 [franchise tax formula used percentage of total capital stock multiplied by ratios of business and property within State to corporation’s entire business and property holdings]; Ford Motor Co. v Beauchamp, 308 US 331, 335-337 [franchise tax calculated as a percentage of outstanding capital stock and surplus apportioned by ratio of gross receipts from intrastate business to total gross receipts]; International Shoe Co. v Shartel, 279 US 429, 433; Western Union Tel. Co. v Massachusetts, 125 US 530, 549, 552; cf. Northwestern Cement Co. v Minnesota, 358 US 450, 460, 464).
These guidelines before us, the "capping” provision stands in clear violation of due process. The amendment to subdivision 1 of section 654 employs the general criterion of "surplus to policyholders”, or net worth, without any effort at apportioning that value. It leaves us completely in the dark as to how much of the tax is attributable to the insurance company plaintiffs’ business in New York and how much to their business in other States. This remains an ineluctable secret. However, it is obvious that, absent a methodology by which to *627 allocate an insurer’s net worth to business activity or to property located in New York — and the statutory formula is bare of such a provision — the "capping” inevitably must reach an arbitrary, unapportioned percentage of out-of-State property.[7] Patently, no means by which to assure that the tax is one focused on an intrastate measure of value is discernable.
It follows that the order appealed from should be reversed and judgment granted in favor of plaintiffs declaring the 1971 amendment to subdivision 1 of section 654 of the Insurance Law unconstitutional.
Chief Judge Cooke and Judges Jasen, Gabrielli, Wachtler and Meyer concur with Judge Fuchsberg; Judge Jones concurs in result.
Judgment reversed, with costs, and judgment granted in favor of plaintiffs declaring the 1971 amendment to subdivision 1 of section 654 of the Insurance Law unconstitutional.

. "Extended coverage” protects against property damage due to various risks including windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles and smoke (Insurance Law, § 651, subd 2).

. Subdivision 34 of section 4 of the Insurance Law defines "surplus to policyholders” as "the excess of total admitted assets over the liabilities of an insurer, which shall be the sum of all capital and surplus accounts minus any impairment thereof’.

. The full text of section 654 (subd 1, par [a]) reads as follows: "All insurers which are members of the association shall participate in its writings, expenses, profits and losses in the proportion that the net direct premiums of each such member (but excluding that portion of premiums attributable to the operation of the association) written during the preceding calendar year bear to the aggregate net direct premiums written in this state by all members of the association. Each insurer’s participation in the association shall be determined annually on the basis of such net direct premiums written during the preceding calendar year as disclosed in the annual statements and other reports filed by the insurer with the superintendent. No member shall be obligated in any one year to reimburse the association on account of its proportionate share in the deñcit from operations of the association in that year in excess of one per cent of its surplus to policyholders and the aggregate amount not so reimbursed shall be reallocated among the remaining members in accordance with the method of determining participation prescribed in this subdivision, after excluding from the computation the total net direct premiums of all members not sharing in such excess deñcit. In the event that the deficit from operations allocated to all members of the association in any calendar year shall exceed one per cent of their respective surplus to policyholders, the amount of such deficit shall be allocated to each member in accordance with the method of determining participation prescribed in this subdivision” (emphasis mine).

. We therefore have no occasion to treat with the unequal protection formulation contained in plaintiffs third cause of action. For the same reason, except as it duplicates the points pleaded in the first cause, we also have no occasion to here consider the additional due process considerations raised by the second cause alone.

. This second level of due process analysis approximates that relevant for commerce clause purposes. Perhaps because due process challenges to State taxing power have typically been joined with commerce clause objections (see Western Union Tel. Co. v Kansas, 216 US 1, and cases cited therein) courts have had some difficulty separating due process considerations from those surrounding the more commonly invoked commerce clause. Though the two concepts are closely related, in fact they are distinct. The commerce clause is concerned with the problem of insuring that State regulatory power does not impede the flow of interstate commerce, while due process deals with the permissibility of the exercise of the State’s power as a matter of fundamental fairness. (See Matter of Aldens v Tully, 49 NY2d 525, 534; Norfolk & Western Ry. Co. v Tax Comm., 390 US 317, 325, n 5; Hartman, State Taxation of Interstate Commerce: A Survey and an Appraisal, 46 Va L Rev 1051, 1058-1065.)

. It has been held that the allocation between interstate and intrastate activity may be only a rough approximation (Matter of Federated Dept. Stores v Gerosa, 16 NY2d 320, 324, supra; Illinois Cent. R. R. Co. v Minnesota, 309 US 157, 161). Of course, it is then open to the taxpayer to show that, in application, the calculus bears no reasonable relationship to property or other values connected with the taxing State (see Norfolk & Western Ry. Co. v Tax Comm., 390 US 317, supra; Hans Rees’ Sons v North Carolina, 283 US 123).

. The departure from settled constitutional precepts is even more marked because, in a related context, when the State has chosen to factor the out-of-State components of an insurance corporation into its calculation of franchise tax liability, it has been careful to prescribe a formula by which to determine New York State’s representative portion of the corporation’s entire net income and capital. Under the taxing scheme set forth in article 33 of the Tax Law, an insurer’s income and capital must be allocated according to the proportion that its premiums written in the State bear to its total premiums and, to a lesser extent, to the proportion that its wages, salaries, compensation and commissions paid in the State bear to the total payments for such services. (See Tax Law, § 1504, subds [a], [b].) Furthermore, adjustments in this formula are possible if it "does not properly reflect the activity, business or income of a taxpayer within the state” (id., subd [d]).