OPINION OF THE COURT
Jasen, J.
We are asked to decide on this appeal whether section 181 of the Tax Law impermissibly discriminates against foreign corporations in violation of the commerce clause of the United States Constitution. We hold that it does and, therefore, do not address petitioner’s equal protection claims.
Petitioner is a foreign corporation incorporated in Illinois which has been licensed to do business in New York since October 1, 1959. In 1973, the New York State Tax Commission (Commission) issued a notice of deficiency to petitioner in the amount of $124,308.51, plus interest, for taxes not paid in 1971. The basis of this notice was the Commission’s contention that petitioner owed an additional license fee for that year which was assessed upon a change in petitioner’s capital structure. Said change converted petitioner’s capital structure from 962,371 shares of $1 par value stock to 12,029,638 shares of stock without par value, having a stated value of $1,402,371.
Petitioner requested a redetermination and a hearing was held. Thereupon, respondents denied the petition and sustained the notice of deficiency. Petitioner then commenced this article 78 proceeding to review the Commission’s determination. Special Term dismissed the petition and the Appellate Division affirmed, holding that section 181 of the Tax Law does not violate either the equal protection clauses of the United States or the New York Constitutions or the commerce clause of the United States Constitution. Petitioner appealed to this court on constitutional grounds.
Section 180 of the Tax Law imposes an organization tax on domestic corporations. The fee assessed is equal to 1/20 of 1% of the amount of the par value of the corporation’s authorized par value stock and 5 cents per share of its authorized stock without par value. By sharp contrast, section 181 of the Tax Law, the complement of section 180, *341 imposes upon foreign corporations wishing to do business in New York a fee of Vs of 1% per share oh its issued par value stock employed within New York and 6 cents per share on each share of its capital stock having no par value which is employed in this State. It is this disparity of treatment which petitioner claims is violative of equal protection and the commerce clause.
Inasmuch as we hold that the challenged legislation imposes an unlawful burden on interstate commerce and therefore violates the commerce clause of the United States Constitution (US Const, art I, § 8, cl 3), it is not necessary to, and we do not, address petitioner’s equal protection claims.
The commerce clause is intended quite simply “to create an area of free trade among the several States” (McLeod v Dilworth Co., 322 US 327, 330). While there has been much debate and some confusion as to how this important Federal interest is to be balanced against a State’s indispensable power of taxation (see Northwestern Cement Co. v Minnesota, 358 US 450, 457; Miller Bros. Co. v Maryland, 347 US 340, 344), three related principles have emerged with unusual clarity. First, it is well settled that no State may “impose a tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business”. (Northwestern Cement Co. v Minnesota, supra, at p 458; Boston Stock Exch. v State Tax Comm., 429 US 318, 329; see, also, Memphis Steam Laundry v Stone, 342 US 389.) Furthermore, a State may not impose taxes on foreign goods for the purpose of “ ‘neutralizing] advantages belonging to the place of origin.’ ” (Halliburton Oil Well Co. v Reily, 373 US 64, 72, quoting Baldwin v G.A.F. Seelig, 294 US 511, 527 [Cardozo, J.].) Nor may a State discriminate in favor of a local business for the purpose of inducing foreign enterprises to become residents so that they may compete on an equal footing. (See Halliburton Oil Well Co. v Reily, 373 US 64, 72, supra; see, also, Nippert v City of Richmond, 327 US 416; Best & Co. v Maxwell, 311 US 454.)
Turning then to the facts of the case before us, a brief review of the legislative intent behind the enactment of *342 section 181 makes clear that the statute suffers from all of these afflictions.
The New York Legislature first imposed a license tax of Vs of 1% on the capital stock of foreign corporations employed within the State in 1895 (L 1895, ch 240), the purpose of this legislation being to insure that foreign corporations paid a tax comparable to the organization tax paid by Ñew York corporations. (People ex rel. Elliott-Fisher Co. v Sohmer, 148 App Div 514, 516, affd 206 NY 634.) While this tax was somewhat effective in preventing businesses from avoiding the New York organization tax by incorporating in New Jersey while continuing to do business in New York, the existing differential in organizational tax rates between the two States provided a continued incentive for a number of corporations doing business in New York to organize in New Jersey. (Annual Reports of Comptroller, NY Assembly Doc No. 3, 122nd Legis Session, 1899, vol 1, pp xxi-xxii; ÑY Assembly Doc No. 7, 123rd Legis Session, 1900, vol 1, pp xxv-xxvi.) In hopes of exerting further pressure on foreign corporations to incorporate in New York, the Legislature reduced the State organization tax to v20 of 1% per share of par value capital stock (L 1901, ch 448), while the license fee on foreign enterprises remained at Vs of 1%.
The disparate tax treatment afforded foreign corporations as a result of this legislation was successful in fulfilling the lawmakers’ goal of forcing many corporations to incorporate in New York, thus providing access by the State to this newfound corporate wealth. (Annual Report of Comptroller, NY Assembly Doc No. 4,125th Legis Session, 1902, vol 1, p xvi.)
This legislative scheme, as it existed at the turn of the century, has remained substantially unchanged, except that in 1921 the domestic organization fee for nonpar value stock was set at 5 cents per share while a tax of 6 cents per share was imposed on similar stock employed in New York by foreign corporations. (L 1921, ch 705, §§ 2, 3.) Thus, the disparity continues, as intended.
The fundamental defect in section 181 is not that it seeks to attract foreign corporations to locate in New York, for that is certainly a permissible goal, but, rather, that it *343 attempts to accomplish this goal by imposing discriminatory and excessive burdens on those foreign corporations in hopes of neutralizing advantages conferred by their home States and thereby inducing them to abandon their present domiciles and incorporate in New York to avoid those excessive burdens. These are the very practices condemned in Boston Stock Exch. v State Tax Comm. (429 US 318, supra) and Halliburton Oil Well Co. v Reily (373 US 64, supra).
Boston Stock Exch. v State Tax Comm. (supra) involved a transfer tax assessed by New York on all sales and transfers of stock where one of five taxable events occurred in New York. (Tax Law, § 270.) A 1968 amendment to that statute altered the imposition of the tax in two ways: (1) only nonresidents who sold stock in New York State were afforded a 50% transfer tax reduction; and (2) any taxpayer, resident or nonresident, who sold stock within New York was entitled to a $350 limit on his or her transfer tax liability. (Tax Law, § 270-a.) Finding the intent of the legislative scheme to be the protection of the New York Stock Exchange, at the expense of foreign exchanges, the court struck down the statute as violative of the commerce clause. In so doing, it reasoned that inducing nonresidents to sell on the New York Stock Exchange by providing favorable tax treatment only to those who traded on the local exchange would trigger the creation of a multitude of preferential trade areas destructive of free trade which the commerce clause is designed to protect. (Boston Stock Exch. v State Tax Comm., 429 US 318, 329, supra, citing Dean Milk Co. v Madison, 340 US 349, 356.)
Along the same vein, in Halliburton Oil Well Co. v Reily (supra), a Louisiana statute which sought to impose a higher use tax on goods acquired outside the State and used in Louisiana than on goods acquired in-State, was declared unconstitutional as violative of the commerce clause. It was recognized there that: “If Louisiana were the only State to impose an additional tax burden for such out-of-state operations, the disparate treatment would be an incentive to locate within Louisiana; it would tend To neutralize advantages belonging to the place of origin.’ Baldwin v. Seelig, Inc., 294 U. S. 511, 527. Disapproval of *344 such a result is implicit in all cases dealing with tax discrimination, since a tax which is ‘discriminatory in favor of the local merchant,’ Nippert v. Richmond, supra, also encourages an out-of-state operator to become a resident in order to compete on equal terms. [Footnote omitted.] If similar unequal tax structures were adopted in other States, a not unlikely result of affirming here, the effects would be more widespread. The economic advantages of a single assembly plant for the appellant’s multistate activities would be decreased for units sent to every State other than the State of residence. At best, this would encourage the appellant to locate his assembly operations in the State of largest use for the units. At worst, it would encourage their actual fractionalization or discontinuance.” {Id., at p 72.)
Similarly, in the case before us, the legislative intent behind section 181 was to make it more profitable for foreign corporations doing business in New York to incorporate in this State. This was accomplished by imposing a higher license fee on businesses incorporated outside New York than the organization tax imposed on domestic enterprises. As such, the New York lawmakers hoped to induce businesses to abandon their current domiciles to come to New York. While there is certainly nothing wrong with a State attempting to attract foreign businesses to it, the commerce clause does not permit this to be done by enacting laws that favor local enterprises at the expense of foreign ones. (Boston Stock Exch. v State Tax Comm., supra; Halliburton Oil Well Co. v Reily, supra; Northwestern Cement Co. v Minnesota, supra; Memphis Steam Laundry v Stone, supra.)
It is clear, therefore, that section 181 does impose an actual burden on interstate commerce. As the reasoning in Halliburton Oil Well Co. v. Reily and Boston Stock Exch. v State Tax Comm. indicates, if a tax scheme such as this were approved, similar ones would be enacted in other States and there would follow a proliferation of insular trade areas providing economic advantages to domestic businesses and not to others. The resulting and continuing need for corporations to relocate, fractionalize or cease operations would substantially and impermissibly burden *345 interstate commerce. Indeed, as far back as the turn of the century, New York’s legislative plan was effective in forcing foreign corporations to relocate in New York and thereby fulfilling the lawmakers’ goal of increasing State revenues. (Annual Report of Comptroller, NY Assembly Doc No. 4, 125th Legis Session, 1902, vol 1, p xvi.) Consequently, where, as here, a statute creates an advantage for New York businesses while imposing a burden on foreign corporations, tax-neutral decisions as to where to incorporate or do business are foreclosed and the resulting discriminatory burden on interstate commerce requires that the statute be declared invalid. (Boston Stock Exch. v State Tax Comm., 429 US 318, 331, supra.)
Respondents’ attempt to justify the discriminatory tax treatment on grounds that such disparity is required to offset the increased administrative costs involved in taxing foreign as opposed to domestic corporations is unavailing. Nowhere do respondents attempt to substantiate this claim with other than conclusory allegations unsupported by the record.
Nor are we persuaded by respondents’ claim that the discrimination here is justified because domestic corporations are subject to New York’s organization tax on all of their authorized shares while foreign corporations are taxed by New York only on issued shares employed in New York. This argument is flawed because petitioner must also pay organization taxes to its home State on all its authorized stock. Thus, any attempt by New York to “compensate” for lower organizational taxes in other States by imposing an excessive license fee on foreign corporations is really nothing more than an unlawful attempt to tax that portion of petitioner’s stock which has no nexus to New York. Such actions are clearly unconstitutional.* (See *346 American Ins. Assn. v Lewis, 50 NY2d 617, 623; see, also, Cudahy Co. v Hinkle, 278 US 460; International Paper Co. v Massachusetts, 246 US 135.)
Finally, we do not believe that the holdings in New York v Latrobe (279 US 421) or People ex rel. Griffith, Inc. v Loughman (249 NY 369) require a different result. In Latrobe (supra, at p 425), the court specifically noted that the case did not involve a complaint of discrimination between foreign and domestic corporations. Similarly, the dispute in Loughman centered upon the disparate treatment of par value as opposed to no-par stock, a question not at issue here.
For all these reasons, the order of the Appellate Division should be reversed, with costs, section 181 of the Tax Law declared unconstitutional and the petition granted.
Chief Judge Cooke and Judges Jones, Wachtler, Meyer, Simons and Kaye concur.
Order reversed, etc.

 We note parenthetically that years ago a State was allowed to subject foreign corporations to discriminatory and excessive taxes in the form of an entrance fee as the price for being permitted to do business in that State regardless of whether or not there was a rational basis for doing so. (Lincoln Life Ins. Co. v Read, 325 US 673; Paul v Virginia, 8 Wall [75 US] 168; cf. People ex rel. Griffith, Inc. v Loughman, 249 NY 369, 374.) This freedom to discriminate as to entrance or license fees without regard to equal protection concerns was viewed as a logical extension of a State’s power to exclude entirely a foreign corporation from doing business within its borders. (Paul v Virginia, supra, at p 181.) However, the continuing validity of that rule, and consequently its application to challenges under either the equal protection or commerce clauses, was conclusively put to rest by the Supreme Court in Western & Southern Life Ins. Co. v Board of Equalization (451 US 648, 667-668), wherein the court declared Lincoln Life *346 Ins. Co. v Read (supra) to be an anachronism and went on to state that “[wle consider it now established that, whatever the extent of a State’s authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose.”