

# THE ATTORNEY GENERAL
## OF TEXAS

June 1, 1987

JIM MATTOX
ATTORNEY GENERAL

Honorable Stan Schlueter                     Opinion No. JM-714
Chairman
Ways and Means Committee                     Re: Constitutionality of House Bill
Texas House of Representatives               No. 966, which would extend the oil
P. O. Box 2910                               severance tax to oil imported from
Austin, Texas   78769                        outside the state of Texas

Dear Representative Schlueter:

Chapter 202 of the Tax Code imposes a severance tax upon the production of oil in this state. Enactment of House Bill No. 966 would amend various sections of chapter 202, by extending the imposition of the oil severance tax to all oil imported into the state, except in certain circumstances. You ask whether the proposed bill is constitutional. You do not indicate the constitutional provisions that concern you. We conclude that House Bill No. 966, as it is presently drafted, violates the federal commerce clause, both with respect to foreign and interstate commerce.

House Bill No. 966 would amend, inter alia, section 202.051 of the Tax Code to read: "There is imposed a tax on the production of oil and a tax on the importation of oil." (Amended language underscored). Section 202.054 of the Tax Code would provide an exemption to the reach of the tax and contains the following:

> EXEMPTIONS. There is exempted from the taxes imposed by this chapter on oil imported into this state oil that:
>
> (1) is located within this state for 30 or fewer days;
>
> (2) has not been altered from the physical state in which it was imported; and
>
> (3) is subject to a contract in which the oil is identified and under the terms of which the oil is required to be delivered to a point outside of this state. (Amended language underscored).

Section 202.251 of the Tax Code, which now imposes primary liability for the severance tax on the producer and secondary liability for the severance tax on the first purchaser and each subsequent purchaser,

would be amended to impose primary liability on the importer as well. The producer and the importer would be primarily liable, but the state could collect the tax from a first or subsequent purchaser if the producer or importer failed to pay. Section 202.153 of the Tax Code would be amended to read:

> FIRST PURCHASER TO PAY TAX. (a) A first purchaser shall pay the tax imposed by this chapter on oil that the first purchaser purchases from a producer and takes delivery on the premises where the oil is produced and on oil purchased from an importer.
>
> (b) A first purchaser shall withhold from payments to the producer or importer the amount of tax that the first purchaser is required by Subsection (a) of this section to pay. This subsection does not affect a lease or contract between the state or a political subdivision of the state and a producer. (Amended language underscored).

This section would require a first purchaser of oil to pay a severance tax on oil that is severed outside of Texas and imported into the state. Other sections of the Tax Code would be amended to include importers in the class of persons who must keep certain records. Because House Bill No. 966 purports to reach both foreign and interstate commerce, we will analyze the statute with respect to both. We first will address interstate commerce.

The commerce clause provides: "The Congress shall have Power . . . To regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, §8, cl. 3. The commerce clause has been interpreted not only as conferring power on the national government to regulate commerce, but also as limiting the states' powers to interfere with commerce. This restriction on state power often is referred to as the "negative implication of the commerce clause" or as the "dormant commerce clause" principle. See, e.g., Wardair Canada, Inc. v. Florida Department of Revenue, 106 S.Ct. 2369 (1986). Under the commerce clause, the Supreme Court has struck down as unconstitutional a variety of state regulatory and taxation measures as unduly burdening commerce. See, e.g., Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984) (holding that a state tax on alcoholic beverages, which exempted certain locally produced beverages, was unconstitutional); Boston Stock Exchange v. State Tax Commission, 429 U.S. 318 (1977) (holding that New York transfer tax on securities transactions was unconstitutional because transactions involving out-of-state sales were taxed more heavily than most transactions involving a sale within the state); Great Atlantic and Pacific Tea Co., Inc. v. Cottrell, 424 U.S. 366 (1976) (holding unconstitutional a Mississippi regulation providing that out-of-state milk could be sold in Mississippi only if the

producing state would accept Mississippi milk on a reciprocal basis); Pike v. Bruce Church, Inc., 397 U.S. 137 (1970) (holding unconstitutional a state regulatory order prohibiting taxpayer from shipping cantaloupes outside the state unless they were packed in state-approved containers).

The Supreme Court in 1977 enunciated a test under the commerce clause that conferred upon states greater latitude in imposing state taxation schemes. The Supreme Court apparently has adopted a construction that rejects formulaic distinctions in favor of a construction emphasizing economic effect. See Hellerstein, State Taxation and the Supreme Court: Toward a More Unified Approach to Constitutional Adjudication, 75 Mich. L. Rev. 1426 (1977). The emerging test under the commerce clause was adumbrated in 1975 in Standard Pressed Steel Co. v. Department of Revenue of Washington, 419 U.S. 560 (1975) and Colonial Pipeline Co. v. Traigle, 421 U.S. 100 (1975), and explicitly articulated in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977) [hereinafter Complete Auto Transit]. Now, interstate commerce can be taxed if the four-prong Complete Auto Transit test is satisfied: the tax must be applied to an activity having a substantial nexus with the taxing state; the tax must be fairly apportioned; the tax must not discriminate against interstate commerce; and the tax must be fairly related to the services provided by the state. Because we conclude that House Bill No. 966 fails the third prong, we need not discuss the first, second, and fourth prongs.

The third prong of the Complete Auto Transit test, i.e., that the tax must not discriminate against interstate commerce, is the test upon which House Bill No. 966 founders. Under earlier approaches to the commerce clause, the constitutionality of a state tax measure did not turn on whether there was tax discrimination against interstate commerce. Originally, the commerce clause was viewed as prohibiting virtually all state taxation of interstate commerce. See, e.g., Low v. Austin, 80 U.S. 29 (1872); Brown v. Maryland, 25 U.S. 419 (1827). By the middle of the nineteenth century, the Court seemed to be of the view that the commerce clause prohibited some, but not all, state taxation of interstate commerce and that a distinction could be made between those areas of interstate commerce in which there was need for national tax uniformity and those areas in which local taxation was permissible. Cooley v. Board of Wardens of the Port of Philadelphia, 53 U.S. 299 (1851). During the 1890s, the Court adopted a new test, holding that "direct" taxes upon interstate commerce were unconstitutional but that "indirect" taxes were not. See, e.g., Adams Express Co. v. Ohio, 165 U.S. 194 (1897).

In 1938, the Court recognized the artificiality of the "direct-indirect" test and adopted a new test whereby state taxes were struck down under the commerce clause if they imposed the risk of cumulative burdens upon interstate commerce that were not likewise imposed upon local commerce. Western Live Stock v. Bureau of Revenue, 303 U.S. 250 (1938). With the exception of Freeman v. Hewit, 329 U.S. 249 (1946), which marked a temporary reversion to the formulaic

distinction between direct and indirect taxes, the Court test focused on the existence of possible multiple burdens. See, e.g., Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450 (1959). In 1977, the aforementioned Complete Auto Transit case was handed down setting forth yet another test, one apparently grounded in practical economic analysis. See Barrett, Constitutional Limitations on Discriminatory State Tax Laws, 2 N.Y.U. Institute on State and Local Taxation and Conference on Property Taxation §1.03[2] (1983); Hartman, Federal Limitations on State and Local Taxation §2:17 (1981); Tribe, American Constitutional Law §§6-14 (1978). See generally 1 Rotunda, Nowak, and Young, Constitutional Law: Substance and Procedure chs. 4, 13 (1986).

Since Complete Auto Transit, the Supreme Court has formulated the anti-discrimination test in several related ways. Essentially, the Court focuses on an analysis of relative tax burdens, specifically whether a state imposes greater tax burdens upon some taxpayers than upon others. The Court has declared that "a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." Armco, Inc. v. Hardesty, 467 U.S. 638, 642 (1984). Applying the Complete Auto Transit analysis in upholding Montana's severance tax upon coal, the Court defined state tax discrimination as "differential tax treatment of interstate and intrastate commerce." Commonwealth Edison Co. v. Montana, 453 U.S. 609, 618 (1981). Under the authority of Maryland v. Louisiana, 451 U.S. 725 (1981) [hereinafter Maryland], we conclude that House Bill No. 966 violates the anti-discrimination test of Complete Auto Transit.

In 1978 Louisiana enacted a series of provisions that collectively came to be known as the Louisiana First Use Tax on Natural Gas. See La. Rev. Stat. Ann. §§47:1301-1307 (West Supp. 1987) (First Use Tax on Natural Gas); id. §47:1351 (First Use Tax Trust Fund); id. §47:647 (severance tax credit); id. §47.11 (tax credit for electric and natural gas service); id. §47:7 (tax credit for certain municipalities). The tax was imposed upon the first use within Louisiana of any natural gas that was not subject to a severance or production tax in Louisiana or any other state. La. Rev. Stat. Ann. §47:1303(A) (West Supp. 1987). A taxable use was defined as

> the sale; the transportation in the state to the point of delivery at the inlet of any processing plant; the transportation in the state of unprocessed natural gas to the point of delivery at the inlet of any measurement or storage facility; transfer of possession or relinquishment of control at a delivery point in the state; processing for the extraction of liquefiable component products or waste materials; use in manufacturing; treatment; or other ascertainable action at a point within the state.

La. Rev. Stat. Ann. §47:1302(8) (West Supp. 1987).

As a practical matter, the actual incidence of the tax fell on natural gas that was produced on the Outer Continental Shelf, where no state has jurisdiction to impose a tax, 43 U.S.C. §1333(a)(2)(A) (1978), if that gas subsequently was sold, transported, or transferred in Louisiana. This apparently was the intent of the Louisiana Legislature when it enacted the tax. See Hellerstein, State Taxation in the Federal System: Perspectives on Louisiana's First Use Tax on Natural Gas, 55 Tulane L. Rev. 601 (1981); Comment, The Louisiana First-Use Tax: Does it Violate the Commerce Clause?, 53 Tulane L. Rev. 1474 (1979). The first use tax was imposed at a rate equal to that imposed by the Louisiana severance tax on natural gas. La. Rev. Stat. Ann. §§47:1303(B), 47:633(9). For those taxpayers who were subject to both the first use tax and the severance tax, a credit was provided against severance tax liability for first use taxes paid. The statutes further provided that the tax be imposed upon the owners, as opposed to the producers, by requiring the tax to be deemed a cost of the owner in preparation of the marketing of the natural gas, id. §47:1303(C); as a practical matter, that ensured that the tax could not be passed back to the producer, but rather that it would be borne either by the owner, which was usually a pipeline company, or by the ultimate consumers, who were ordinarily out-of-state.

The Supreme Court struck down the Louisiana tax on two broad grounds, violation of the supremacy clause and violation of the commerce clause. The tax was held to run afoul of the supremacy clause by interfering with the authority of the Federal Energy Regulatory Commission to regulate the determination of the proper allocation of costs associated with the sale of natural gas to consumers. See Natural Gas Act 15 U.S.C. §§717 et seq., and the Natural Gas Policy Act of 1978, 15 U.S.C. §§3301 et seq. This ground need not concern us, because Congress has not legislated in this area with regard to oil. Significantly, the tax was held to violate the commerce clause in two ways. First, the tax was held to discriminate against interstate commerce in favor of local interests through its use of various tax credits and exclusions. The practical effect of the statutes, taken together, was that state consumers of outer continental shelf gas were substantially protected against the impact of the tax, while out-of-state consumers were burdened with the tax, and had the benefits of untaxed outer continental shelf gas that could have been cheaper than locally produced gas; the operation of the tax, moreover, had the effect of encouraging those persons who produced outer continental shelf gas to develop and produce Louisiana natural gas. Second, the tax was not justified as a compensatory tax, compensating for the effect of the state's severance tax on local production of natural gas. The Court concluded that the state had no sovereign interest in being compensated for the severance of resources from federally-owned outer continental shelf land.

The bill would add an importation tax to the chapter imposing a severance tax. It is clear that an importation tax considered alone,

would violate the commerce clause because it would burden interstate commerce only; such a tax scheme would be facially unconstitutional. See, e.g., Boston Stock Exchange v. State Tax Commission, supra; Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64 (1963); Welton v. Missouri, 91 U.S. 275 (1876). It is urged that the proposed Texas importation tax not be viewed in isolation, but that it be considered in conjunction with the Texas severance tax, which is imposed at the same rate as would be the proposed importation tax. It is suggested that the two taxes taken together are compensatory and that such a taxing scheme would impose an equitable and nondiscriminatory burden on all oil in the state, regardless of the state in which it is severed. On the basis of the Maryland case, we disagree. But before we explain the reasons for our conclusion, we will first discuss compensatory taxes.

Even though a tax statute results in unequal tax treatment of different groups of taxpayers, the statute still may not be held to be discriminatory under the commerce clause if other related taxes equalize the tax burdens borne by the different groups, i.e., if the taxes are held to be compensating. The principle of compensating or complementary taxes is one that the Supreme Court has long held will save an otherwise discriminatory tax from constitutional attack. As long ago as 1868, the Court held that an excise tax on bringing liquor into a state for sale and a tax on manufacturing liquor in that state were held to be complementary. Hinson v. Lott, 75 U.S. (8 Wall.) 148 (1868). In 1928 the Court upheld a mileage tax imposed on buses used in interstate commerce on the theory that buses used in intrastate commerce were subjected to a gross receipts tax. Interstate Busses Corp. v. Blodgett, 276 U.S. 245 (1928). Therein the Court set forth the rationale for a complementary tax scheme:

> The two statutes are complementary in the sense that while both levy a tax on those engaged in carrying passengers for hire over state highways in motor vehicles, to be expended for highway maintenance, one affects only interstate and the other only intrastate commerce. Appellant plainly does not establish discrimination by showing merely that the two statutes are different in form or adopt a different measure or method of assessment, or that it is subject to three kinds of taxes while intrastate carriers are subject only to two or to one.

Id. at 251.

In Gregg Dyeing Co. v. Query, 286 U.S. 472 (1932), the Court upheld a state statute imposing a tax on gasoline imported into the state and stored for future use or consumption, because the state enacted complementary tax statutes imposing equivalent excise taxes on the sale and use of gasoline in the state. The Court declared:

> The question of constitutional validity is not to be determined by artificial standards. What is required is that state action, whether through one agency or another, or through one enactment or more than one, shall be consistent with the restrictions of the Federal Constitution. There is no demand in the Constitution that the State shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the State's constitutional power.

Id. at 480.

The classic example of compensating or complementary taxes is a sales tax and a use tax. Use taxes specifically are designed to prevent sales tax avoidance by taxpayers buying outside the state personal property subject to the sales tax. See 55 Tulane L. Rev. 601, 621 (1981). A use tax that is imposed on the privilege of using property within the state prevents sales tax avoidance, because the taxpayer buying outside the state is taxed when the property is brought into the state for use. The Supreme Court in 1937 specifically upheld a use tax against a commerce clause challenge; examining the way in which the two taxes interacted, the Court found no discrimination. The Court concluded:

> When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into [the state]. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local.

Henneford v. Silas Mason Co., 300 U.S. 577, 584 (1937).

It is urged that the proposed Texas tax, when considered together with the Texas severance tax, fairly could be deemed compensatory. The Supreme Court has been less than clear in setting forth a specific test. For example, older decisions held that different types of taxes on unrelated activities were complementary. See, e.g., Interstate Bus Corp. v. Blodgett, supra; Hinson v. Lott, supra. In Alaska v. Arctic Maid, 366 U.S. 199 (1961) the Court focused on the competitive effects of the taxation scheme in determining whether two taxes were complementary. In more recent cases, the Court was less willing to consider

unrelated activities as complementary.  See, e.g., Maryland; Armco, Inc. v. Hardesty, supra.

The most recent formulations of the test focused on whether the taxes were imposed upon "substantially equivalent events" in order for them to be deemed compensatory.  In Armco, Inc. v. Hardesty, 467 U.S. at 643, it was held that "manufacturing and wholesaling are not 'substantially equivalent events' such that the heavy tax on in-state manufacturers can be said to compensate for the admittedly lighter burden placed on wholesalers from out of state."  An examination of the relevant cases reveals two principles for which the compensatory tax cases can be cited.  First, only one state's tax laws will be considered in determining whether two taxes are compensatory.  See, e.g., Austin v. New Hampshire, 420 U.S. 656 (1975); Travis v. Yale & Towne Manufacturing Co., 252 U.S. 60 (1920).  Second, two complementary taxes must impose essentially equivalent economic burdens, or at least not impose a greater tax burden upon interstate taxpayers.  See, e.g., Halliburton Oil Cementing Co. v. Reily, supra.  The Court, though, has not defined what constitutes "substantially equivalent events."  In Armco, Inc. v. Hardesty, supra, and Maryland, the Court did indicate what were not "substantially equivalent events."

In Maryland, the case that controls the instant request, the Court held that the Louisiana first use tax could not be justified as compensating for the effect of the state's severance tax on local production since the two events were not considered to be substantially equivalent.  The Court declared:  "[T]he concept of a compensatory tax first requires identification of the burden for which the State is attempting to compensate."  Id. at 758.  The Court viewed the severance tax as compensating the state for its depletion of its natural resources.  The Louisiana first use tax was not designed for the same purpose since it was levied upon natural gas taken from the continental shelf, and the state had no right to be compensated for those federally owned resources.

> But the First-Use Tax is not designed to meet these same ends since Louisiana has no sovereign interest in being compensated for the severance of resources from the federally owned OCS land.  The two events are not comparable in the same fashion as a use tax complements a sales tax.  In that case, a State is attempting to impose a tax on a substantially equivalent event to assure uniform treatment of goods and materials to be consumed in the State.  No such equality exists in this instance.

Id. at 759.  Analogously, we think that the Court would hold that the state of Texas has no right to be compensated for oil severed from other states and would declare the proposed Texas scheme unconstitutional as to interstate oil.

By its terms, House Bill No. 966 reaches also oil entering Texas from outside the United States. The commerce clause, of course, reaches foreign commerce as well as interstate commerce. The leading case under the foreign commerce clause is Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434 (1979), which held unconstitutional a California ad valorem property tax applied to cargo containers of Japanese shipping companies. The Court ruled that the Complete Auto Transit four-prong test should be applied under the clause. The Court also provided that, under the foreign commerce clause two additional tests must be met: the tax must not create a substantial risk of multiple international taxation (as opposed to actual multiple taxation) and the tax must not prevent "the federal government from 'speaking with one voice' when regulating commercial relations with foreign governments." Id. at 451. Because we have already concluded that the third prong of the Complete Auto Transit test is violated, we need not discuss the other tests.

## S U M M A R Y

The proposed House Bill No. 966, as it is presently drafted, which purports to extend the Texas severance tax to oil imported into the state, violates the commerce clause of the United States Constitution, with respect to both foreign and interstate commerce, and is unconstitutional.

Very truly yours,

J I M   M A T T O X
Attorney General of Texas

JACK HIGHTOWER
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General