OPINION OF THE COURT
Louis B. York, J.
In this motion, plaintiff R.J. Reynolds Tobacco Company (RJR) asks that this court (1) declare Administrative Code of the City of New York § 11-602 (8) (a) (10); (j); and (b) (11) unconstitutional under the United States Constitution’s Commerce Clause (US Const, art I, § 8, cl [3]); (2) find that a notice of determination issued by defendant City of New York Department of Finance against RJR (the Notice) is void; and (3) permanently enjoin defendants City of New York Department of Finance and Marc V. Shaw, Commissioner of the City of New York Department of Finance (collectively referred to as the City) from enforcing Administrative Code § 11-602 (8) (a) (10); (j) and (b) (11) and from enforcing the Notice. Currently, RJR moves for summary judgment. For the reasons below, I grant RJR’s motion.
BACKGROUND
I. Sections 167 and 168 of the Internal Revenue Code (26 USC)
Under section 167 of the Internal Revenue Code (26 USC), a taxpayer can take a depreciation deduction for property used in its business or "held for the production of income” if that property is subject to exhaustion, wear and tear, decline from natural causes, decay, or obsolescence. (26 USC § 167 [a].) In general, the taxpayer can depreciate only the cost of the property minus a reasonable estimate of the property’s salvage value. (S Rep No. 97-144, 97th Cong, 1st Sess 39, reprinted in 1981 US Code Cong & Admin News 105, 145.) The taxpayer divides the deduction over the course of the estimated useful life of the property.
Section 167 once offered taxpayers the option of selecting its method of depreciation. The two depreciation schemes relevant to this action are the straight-line method and the declining-balance method. Using the straight-line method, a taxpayer first subtracts the property’s salvage value and then divides its deductions equally over the useful life of the property.[1] In this, the original method for depreciating property, the deductions *676 were evenly divided to effectuate the goal of "allowing] taxpayers to match accurately, for tax accounting purposes, the cost of an asset to the income stream that the asset produced”. (Simon v Commissioner of Internal Revenue, 68 F3d 41, 44 [2d Cir 1995].)
If the property had a useful life of three years or more, the taxpayer was able to use the declining-balancing method. Under this method, the taxpayer could take depreciation deductions at an accelerated rate not exceeding twice the rate appropriate under the straight-line method. Although the asset cannot be depreciated below its reasonable salvage value, the taxpayer can determine its annual depreciation allowances without taking the salvage value into account. (Treas Reg [26 CFR] § 1.167 [b] [2] [as amended by TD 6712, 29 Fed Reg 3653 [1964].)[2] Using the declining-balance method, which is "designed to encourage investment in depreciable assets,” a taxpayer can recover as much as 40% of its investment during the first quarter of the property’s useful life. (Rose and Chommie, Federal Income Taxation [3d ed 1988].)
In 1981, Congress passed the Economic Recovery Tax Act of 1981 (ERTA) (Pub L 97- 34, 95 US Stat 172 [codified as amended in scattered sections of 26 USC]). ERTA "provide[d] the largest tax reduction in history” (S Rep No. 97-144, at 2, 97th Cong, 1st Sess 49, reprinted in 1981 US Code Cong & Admin News 105, 108) in order to stimulate economic growth in the United States. (Simon v Commissioner of Internal Revenue, 68 F3d, supra, at 45; Collins Music Co. v United States, 21 F3d 1330, 1332 [4th Cir 1994].) Among other things, Congress determined that the existing rules governing depreciation allowances did "not provide the investment stimulus that [was] essential for economic expansion.” (S Rep No. 97-144, at 47, 97th Cong, 1st Sess 39, reprinted in 1981 US Code Cong & Admin News 105, 152.) Therefore, ERTA devised an accelerated system of *677 depreciation for property used in business, called the accelerated cost recovery system (ACRS). (S Rep No. 97-144, at 6, 97th Cong, 1st Sess 39, reprinted in 1981 US Code Cong & Admin News 105, 112; see, Collins Music Co. v United States, 21 F3d, supra, at 1332.) The current version of this system, as revised by the Tax Reform Act of 1986, largely replaces section 167 for property placed in service after 1981. (26 USC § 168.) Under the ACRS, taxpayers depreciate tangible property not excepted from this provision by using the declining-balance method until the straight-line method will yield a larger depreciation allowance. (26 USC § 168 [a], [b].) At that point, the taxpayer switches to the straight-line method. (Id.) In addition, the salvage value of the property is $0. (26 USC § 168 [b] [4].) Finally, 26 USC § 168 sets forth timetables for determining useful life which accelerate the rate of depreciation.[3] Taxpayers must depreciate using the ACRS unless they explicitly opt out of it. (Collins Music Co. v United States, 21 F3d, supra, at 1332.)[4]
II. The Challenged Taxing Scheme
Title 11, chapter 6, subchapter 2 of the Administrative Code discusses New York City’s general corporation tax. Pursuant to Administrative Code § 11-603 (1), "every domestic or foreign corporation [that does business, employs capital, or owns or leases property in the city in a corporate or organized capacity] * * * shall annually pay a tax, upon the basis of its entire net income, or upon such other basis as may be applicable.” Administrative Code § 11-604 (1) (E) provides that the corporate taxpayer is taxed on a portion of its entire net income (ENI). Section 11-602 (8) of the Administrative Code explains that the taxpayer determines its ENI by computing its Federal taxable income and making certain adjustments, including deductions.
The relevant adjustment here is a depreciation deduction, discussed in the challenged Code provisions. Section 11-602 (8) *678 (b) (11) of the Administrative Code states that in calculating its ENI the taxpayer shall not exclude from its income "for taxable years beginning after December thirty-first, nineteen hundred eighty-one, except with respect to * * * [recovery property] placed in service in this state in taxable years beginning after December thirty-first, nineteen hundred eighty-four * * * the amount allowable as a deduction * * * under section one hundred sixty-eight of the internal revenue code” (emphasis supplied).[5] Section 11-602 (8) (j) of the .Administrative Code states: "for taxable years beginning after December thirty-first, nineteen hundred eighty-one, except with respect to * * * [recovery property] placed in service in this state in taxable years beginning after December thirty-first, nineteen hundred eighty-four * * * a taxpayer shall be allowed with respect to [recovery] property [a] * * * deduction allowable under section one hundred sixty-seven of the internal revenue code” (emphasis supplied). (See also, Administrative Code § 11-602 [8] [a] [10] [stating that ENI does not include the amount allowable as a deduction under section 11-602 (8) (j)].) The practical effect of the provisions is two-pronged. First, if a corporate taxpayer took accelerated depreciation deductions under Internal Revenue Code (26 USC) § 168 in calculating its Federal taxable income, under section 11-602 (8) (b) the taxpayer must add that amount back into its ENI if the deduction is for property placed in service outside of New York. Second, under section 11-602 (8) (j) the taxpayer can take a deduction for that property under Internal Revenue Code (26 USC) § 167. For property placed in service in New York, however, the taxpayer need not make this adjustment; instead, it can take the ACRS deduction in computing its local taxes. (See, Administrative Code § 11-602 [8] [b] [11]; [j] [excepting property placed in service in New York from these provisions].)
III. Factual and Procedural Background
RJR is a business organized under New Jersey law; its principal place of business is Winston-Salem, North Carolina, and at least some of its property is placed in service outside of New York. Because RJR does business in New York City, it pays New York City taxes pursuant to the Administrative Code provisions discussed above. RJR completed its New York City *679 tax returns in a timely fashion for the tax years ending December 31, 1987 and December 31, 1988. In computing its ENI for these returns, however, it used the ACRS system of depreciation set forth in Internal Revenue Code (26 USC) § 168 for property placed in service both within and without the State of New York.
The Department of Finance audited RJR’s tax returns for the years in question. The Department of Finance recalculated RJR’s ENI pursuant to the scheme discussed above, and found deficiencies. On September 29, 1993, the Department of Finance issued the notice at the heart of this lawsuit, which alleges that RJR owes the City tax deficiencies of $281,970.70. This amount includes $168,156 in taxes owed, $96,999.10 in interest owed, and $16,815.60 in penalties.
Pursuant to Tax Law § 1138 (a), plaintiff challenged the tax assessment by filing a request for conciliation conference with the Department of Finance’s Conciliations Bureau on December 15, 1993. At a conference held on February 22, 1994, a conferee sustained the notice as it related to RJR’s depreciation deductions for property placed in service outside of New York. This resulted in a determination that RJR owes $105,064 in back taxes. The conferee did not order that RJR pay penalties or interest. Subsequently, RJR filed this CPLR article 78 proceeding.
COMMERCE CLAUSE ANALYSIS
The Commerce Clause vests in Congress the power "[t]o regulate commerce with foreign nations, and among the several States, and with the Indian tribes”. (US Const, art I, § 8, cl [3].) Although the Constitution does not specifically address the States’ power to regulate commerce, the Commerce Clause operates as an implicit limitation: It is " 'not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force create[s] an area of trade free from interference by the States’ ”. (Boston Stock Exch. v State Tax Commn., 429 US 318, 328 [1977]; accord, Associated Indus. v Lohman, 511 US 641, 646-647 [1994].) This restriction is commonly referred to as the negative or dormant aspect of the Commerce Clause. (See, Fort Gratiot Sanitary Landfill v Michigan Dept. of Natural Resources, 504 US 353, 359 [1992].)
The dormant Commerce Clause does not " 'relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the busi *680 ness.’ ” (Complete Auto Tr. v Brady, 430 US 274, 279 [1977], quoting Western Live Stock v Bureau of Revenue, 303 US 250, 254 [1938].) Therefore, States have the power to tax corporations that are engaged in interstate commerce for the privilege of doing business within the State. (Complete Auto Tr. v Brady, 430 US 274.) However, the Commerce Clause still serves to limit the States’ taxing power: " '[A] tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business’ ” is unconstitutional. (Boston Stock Exch. v State Tax Commn., 429 US, supra, at 329, quoting Northwestern States Portland Cement Co. v Minnesota, 358 US 450, 458 [1959].)
Initially, the City contends that this proceeding must be dismissed because the challenged ordinances calculate deductions relating to property and therefore do not involve commerce. The City is correct that many of the cases cited by RJR involve taxes on commerce or tax credits based on commercial activities. (E.g., Boston Stock Exch. v State Tax Commn., 429 US 318 [1977], supra [tax on sales]; Westinghouse Elec. Corp. v Tully, 466 US 388 [1984] [tax credit].) However, as the Supreme Court has stated, courts should not "attach any constitutional significance to * * * formal distinctions that lack economic substance”. (Westinghouse Elec. Corp. v Tully, 466 US, at 405; see generally, Commonwealth Edison Co. v Montana, 453 US 609, 614-615 [1981] [employing practical approach to defining "commerce” and finding tax imposed on goods prior to entry into stream of commerce appropriate for Commerce Clause review].) Here, where the property depreciated is used in the commercial activity for which the corporation is being taxed, and where the deduction is from a tax on interstate commerce, the distinction the City draws has neither economic nor constitutional significance. Thus, RJR’s challenge is firmly within the purview of the Commerce Clause. (See, Beatrice Cheese v Wisconsin Dept. of Revenue, 1993 WL 57202 [Wis Tax App Commn, Feb. 24, 1993] [evaluating depreciation deduction scheme under Commerce Clause].)
To determine whether a challenged tax can survive Commerce Clause scrutiny, courts apply a four-part test, sustaining the law so long as the activity taxed has " 'a substantial nexus with the taxing [municipality], is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided in the [municipality]’ ”. (Amerada Hess Corp. v New Jersey Taxation Div., 490 US 66, 72 [1989], quoting Complete Auto Tr. v Brady, 430 US, supra, at 279.) RJR claims *681 only that the tax fails to satisfy the third prong of this test. A tax can be found unconstitutional on this basis "if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce”. (Amerada Hess Corp. v New Jersey Taxation Div., 490 US, at 75.)
If, in evaluating the challenged taxing scheme, a court finds that the scheme discriminates on its face against interstate commerce, the court virtually always will find the tax unconstitutional. (Chemical Waste Mgt. v Hunt, 504 US 334, 342 [1992].) A facially discriminatory tax only survives if "the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest”. (C & A Carbone v Town of Clarkstown, 511 US 383, 392 [1994]; see, Reeves, Inc. v Stake, 447 US 429, 438-439 [1980].) The burden is on the municipality to show that the law is valid. (Farmland Dairies v McGuire, 789 F Supp 1243, 1250-1251 [SD NY 1992].) Furthermore, the interest advanced by the municipality to justify the law must be "unrelated to economic protectionism”. (Fort Gratiot Sanitary Landfill v Michigan Dept. of Natural Resources, 504 US, supra, at 359; accord, New Energy Co. v Limbach, 486 US 269, 274 [1988].) Similarly, where a tax provision does not facially discriminate against interstate commerce but its purpose is economic protectionism, the law is also subject to strict scrutiny. (See, e.g., Bacchus Imports v Dias, 268 US 263 [1984].)
Finally, if the law "regulates evenhandedly to effectuate a legitimate local public interest [without facially or intentionally discriminating against interstate commerce], and its effects on interstate commerce are only incidental”, the test articulated in Pike v Bruce Church (397 US 137, 142 [1970]) applies. (See, Oregon Waste Sys. v Department of Envtl. Quality, 511 US 93, 99 [1994].) Under Pike, an evenhanded regulation is valid unless it imposes a burden on interstate commerce which "is clearly excessive in relation to the putative local benefits”. (Pike v Bruce Church, 397 US, at 142.)
Although the Supreme Court has never addressed the constitutionality of a tax involving depreciation deductions, it has invalidated taxing schemes which had discriminatory effects analogous to the effect alleged by RJR. In Boston Stock Exch. (supra), the Court examined whether a State has the power to tax in a way that discriminates against out-of-State transactions. (429 US, at 335.) The case involved an amended version of a New York law which provided tax advantages to those who purchased or sold stocks using New York brokers. *682 The Court held that the amendment upset the prior equilibrium, impermissibly "foreclos[ing] tax-neutral decisions and creating] both an advantage for the exchanges in New York and a discriminatory burden on commerce to its sister States”. (Supra, at 331.) Because "[t]he prohibition against discriminatory treatment of interstate commerce follows inexorably from the basic purpose of the Clause” (supra, at 329), the lack of evenhandedness in the taxing scheme was fatal. (See, supra, at 331-332.) Westinghouse Elec. Corp. v Tally (466 US 388 [1984], supra) applied the principles discussed in Boston Stock Exch. to unanimously invalidate a New York statute which provided a franchise tax credit only on the gross receipts of goods shipped out of the State. (Supra, at 393.) "When a tax, on its face, is designed to have discriminatory economic effects”, the Court concluded, the law is unconstitutional. (Supra, at 406-407; see also, New Energy Co. v Limbach, 486 US 269 [1988], supra [declaring Ohio’s motor vehicle fuel sales tax invalid]; Maryland v Louisiana, 451 US 725 [1981] [finding Louisiana use tax on natural gas unconstitutional].)
Recently, the New York Court of Appeals evaluated a flat tax placed on the adjusted gross receipts of long distance carriers. (American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., 84 NY2d 31 [1994], rearg denied 84 NY2d 838 [1994].) The tax allowed in-State carriers to take a dollar-for-dollar deduction for their access fees, but allowed long distance carriers to take the deduction only in proportion to their property within the State. (Supra, at 34-35.) The Court stated that " ' "discrimination” simply means differential treatment of instate and out-of-state economic interests that benefits the former and burdens the latter.’ ” (Supra, at 34, quoting Oregon Waste Sys. v Department of Envtl. Quality, supra, 511 US, at 99.) Because the unequal treatment of the carriers "resulted] solely from the situs of their activities and provide[d] a commercial advantage to local businesses”, the Court held that the statute was unconstitutional. (American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., 84 NY2d, at 35.)
Based on the principles discussed in these cases, this court declares that the challenged ordinances are unconstitutional. The ordinances overtly differentiate between property placed in service in New York and property placed in service outside of New York, based solely on the situs of the corporate taxpayer’s activities. This differential treatment constitutes facial discrimination. (See, American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., supra, 84 NY2d, at 35.) *683 This is enough to render the taxing scheme defective. (See, C & A Carbone v Town of Clarkstown, supra, 511 US, at 392-393; Oregon Waste Sys. v Department of Envtl. Quality, supra, 511 US, at 99-100.) It is irrelevant that the ordinances discriminate against out-of-State businesses by disallowing a more advantageous tax deduction rather than by imposing a higher tax, as the result — an adverse economic impact — is identical. (Cf., Westinghouse Elec. Corp. v Tully, 466 US 388, 404 [1984], supra [rejecting distinction, for Commerce Clause purposes, between statutes imposing higher taxes and statutes disallowing tax credits].)
In addition, the ordinances have the practical effect of discriminating against taxpayers whose property is located outside of New York. The ACRS depreciation scheme, which was devised to encourage business investment in property, offers taxpayers "the advantage of deferring the payment of income taxes from early in a plant asset’s life until later * * * This results in smaller amounts of taxable income and income taxes paid in the early years”. (Larson and Miller, Fundamental Accounting Principles, at 546 [1993].) As the City correctly notes, under such a scheme the taxpayer must pay larger amounts of income taxes in the later years of the property’s life. (See, ibid.) Nonetheless, the City’s argument that the ACRS is not advantageous has no merit because under the ACRS, the salvage value of the property is zero. The City’s position is also incorrect because of the time value of money: Because a taxpayer can invest the money or put the money into an interest-bearing account, it is worth more to have a set sum of money today than to have the promise to receive that sum in the future. (See, United States v Broderson, 67 F3d 452, 457 [2d Cir 1995] [noting that "the value of $1,000 in 1996 is greater than the value of $1,000 in 2096”]; Partington v Broyhill Furniture Indus., 999 F2d 269, 274 [7th Cir 1993] [finding that prejudgment interest was properly awarded to the plaintiff because of the time value of the money lost].)
By only allowing taxpayers to take advantage of this accelerated scheme for the property placed in service in New York State, the New York City taxing scheme impermissibly " 'provides] a direct commercial advantage to local business’ ”. (Boston Stock Exch. v State Tax Commn., 429 US, supra, at 329.) Here, the cost to RJR is $105,064 — the amount the Notice states RJR owes in back taxes. (See also, supra, nn 2, 3 [comparing deductions under the various systems].) Clearly, RJR was harmed by the discrimination.
*684 In further support of its argument that the ACRS is not advantageous, the City notes that, recognizing the benefits of Internal Revenue Code (26 USC) § 167, section 168 allows a taxpayer to opt into section 167 when it prefers that depreciation scheme. Rather than bolstering the City’s argument, however, this weakens it: The taxpayer with property placed in service in New York has the additional benefit of selecting the taxing scheme most advantageous to it. Thus, another opportunity is denied to the taxpayer whose property is placed in service outside New York.
RJR refers this court to the Wisconsin Tax Appeals Commission decision in Beatrice Cheese v Wisconsin Dept. of Revenue (1993 WL 57202 [Wis Tax App Commn, Feb. 24, 1993]). In Beatrice Cheese, the Tax Commission struck down a taxing scheme nearly identical to the one challenged here. The Wisconsin statutes disallowed the ACRS deductions for property located outside of Wisconsin, but allowed taxpayers to use the depreciation scheme for property located within Wisconsin. (Supra, at 2.) The Tax Commission found that "[t]he effect of this differential treatment * * * is to impose a higher franchise tax burden on a business solely because some or all of its depreciable property is located outside rather than inside the political and geographic confines of the state * * * This is clearly facial discrimination against interstate commerce and runs afoul of a long line of court decisions invalidating such state tax provisions as violative of the Commerce Clause of the United States Constitution” (supra, at 3). Because the Tax Commission found the provisions facially violative and designed to exert " 'an inexorable hydraulic pressure on interstate businesses to ply their trade within the State’ ” (supra, at 3, citing American Trucking Assns. v Scheiner, 483 US 266, 286 [1987]), it declared the statute invalid without further inquiry. Although this court is not bound by the Wisconsin Tax Commission’s interpretation of a Wisconsin taxing scheme, I find the analysis set forth in Beatrice Cheese persuasive and adopt the Commission’s reasoning.
The City contends that the statutory scheme found invalid in Beatrice Cheese (supra) is distinguishable from the New York City ordinances; the former gave preferential treatment to property "located” in Wisconsin, while the ordinances here treat property differently if it is "placed in service” in New York. According to the City, this difference is critical, shifting the emphasis away from the location of the property and taking the ordinances out of the scope of the Commerce Clause. *685 However, the court fails to see the practical import of this semantic distinction: Property can only be placed in service in New York if it is located in New York.
The City suggests a contrary interpretation: It contends a property holder can place property in service within the State, move it, and continue to take the accelerated deduction once the property is placed in service outside of New York. Applying this interpretation, the City avers, "placed in service” becomes a "temporal concept” rather than one tied to the geographic location of the property. However, as RJR notes, "[w]hether or not property placed in service in New York will be purchased or permanently located there, the very act of placing such property in service in New York amounts to instate economic activity that the City may not require as the price of a tax benefit”. (Plaintiffs reply brief, at 20.)
Furthermore, the City’s argument is not consistent with the language of the ordinances. A plain reading of the ordinances indicates that the property must remain in service in New York in order for the taxpayer to continue to take advantage of the ACRS. Thus, the ordinances disadvantage the out-of-State property holders on a continuing basis. In addition, as RJR points out and the City concedes, when the property depreciated is huge, heavy machinery or equipment which must be placed in a factory to function, it is impractical to briefly place the property in service in New York and then relocate it. (See, defendants’ brief, at 39 ["convenience and practicality will ordinarily suggest that property, which is to be placed in service in New York State, be purchased and located there”].) Thus, the taxing scheme impermissibly disadvantages out-of-State corporations in the hope that this will encourage relocation to New York.[6]
Even though the ordinances are overtly discriminatory, this court would still sustain them if the City established, under rigorous scrutiny, that the ordinances provide the only available means of advancing a legitimate local interest. (See, C & A Carbone v Town of Clarkstown, supra, 511 US, at 392 [reiterating this rule].) Without conceding the discriminatory nature of the taxing scheme, the City contends that the scheme has a legitimate purpose: encouraging taxpayers to purchase and locate their property in New York. (Defendants’ Mem of *686 Law, at 39.) Because the ordinances encourage this activity without requiring it, the City argues, the ordinances are valid. (Id.) The City cites a number of Supreme Court cases in support of this point, including Boston Stock Exch. (supra), which states that States can "structur[e] their tax systems to encourage the growth and development of intrastate commerce and industry”, and can "compete with other States for a share of interstate commerce.” (Boston Stock Exch. v State Tax Commn., 429 US, supra, at 336-337.) Even if the ordinances did burden interstate commerce, the City contends, their legitimate goal would render them constitutional.
The City’s argument must fail. For Boston Stock Exch. (supra) also contains the following stricture: Although States can encourage intrastate commerce and compete for the interstate commerce market, they cannot do so by discriminatorily taxing interstate commerce. (Supra.) Whenever a municipality attempts to foster in-State economic growth by burdening out-of-State interests, these measures constitute economic protectionism. (New Energy Co. v Limbach, 486 US 269, 273 [1988], supra; see, Boston Stock Exch. v State Tax Commn., 429 US, at 336.) Economic protectionism, which is flatly prohibited by the Commerce Clause, cannot be used to justify these otherwise invalid ordinances. (See, C & A Carbone v Town of Clarkstown, supra, 511 US, at 392; Fort Gratiot Sanitary Landfill v Michigan Dept. of Natural Resources, 504 US 353, 359 [1992], supra.) The City’s contention — essentially, that it can ignore the constitutional limitation placed on its ability to encourage commerce in New York because it wants to encourage commerce — is both circular and frivolous.
Furthermore, the distinction the City attempts to draw between laws that encourage taxpayers to locate their businesses in the taxing State and laws that require relocation is unpersuasive; this court cannot imagine that many taxing laws actually force taxpayers to locate their property in the taxing State. In both Boston Stock Exch. and Westinghouse (supra), the Supreme Court declared statutes unconstitutional where their purported purpose — like the purpose advanced by the City here — was to "encourage” business activity in the taxing State. (See, Westinghouse Elec. Corp. v Tully, 466 US, at 393 [quoting State’s Budget Report, which claimed goal of tax was to " 'provide a positive incentive for increased business activity’ ” in the taxing State]; Boston Stock Exch. v State Tax Commn., 429 US, at 326-327 [quoting legislative history, which asserted legislation aimed to " 'encourage’ ” nonresidents to effect sales *687 of stocks in the taxing State].) Thus, as the City presents no other argument to justify its discriminatory taxing schemes, the ordinances are invalid. (See, American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., 84 NY2d, supra, at 35.)
I have considered the City’s additional arguments and found that they have no merit. In particular, I note that the City has presented a number of "quantitative arguments” designed to show that any alleged disadvantages to FIR and similarly situated taxpayers are minimal. Because the ACRS set forth in section 168 does not apply to all types of property, the City also claims that not all taxpayers will be negatively affected by the challenged ordinances.
These arguments are unavailing. When a tax is facially discriminatory, a court " 'need not know how unequal the Tax is before concluding that it unconstitutionally discriminates’ ”. (Westinghouse Elec. Corp. v Tully, supra, 466 US, at 407, quoting Maryland v Louisiana, 451 US 725, 760 [1981], supra.) "The volume of commerce affected measures only the extent of the discrimination [and] is of no relevance to the determination whether a [municipality] has discriminated against interstate commerce.” (Wyoming v Oklahoma, 502 US 437, 455 [1992].) The City’s argument that the doctrine of de minimis non curat lex applies here is incorrect, and the cases it cites do not lend support to its argument. (See, e.g., Hudson v McMillian, 503 US 1, 2 [1992] [Eighth Amendment does not reach de minimis uses of force].) For similar reasons, there is no merit to the City’s argument that summary judgment is inappropriate because triable issues of fact remain regarding the extensiveness of RJR’s tax disadvantage. To the extent that the City is encouraging the court to utilize the balancing test articulated in Pike v Bruce Church (397 US 137 [1970] [discussed supra, at 681]), the court must refuse. As already stated, the Pike test only applies if the challenged ordinances are neither facially nor purposefully discriminatory.
CONCLUSION
There is an "exceedingly strong presumption of constitutionality” applied to municipal ordinances such as the ones considered here (Lighthouse Shores v Town of lslip, 41 NY2d 7, 11 [1976]), and this court is extremely sensitive to the limited role of the judiciary in evaluating State and municipal enactments. Neither States nor municipalities are wholly insulated from judicial review, however: Where an ordinance is unconsti *688 tutional beyond a reasonable doubt, the presumption of constitutionality is rebutted. (See, e.g., McMinn v Town of Oyster Bay, 66 NY2d 544 [1985] [holding town zoning ordinance unconstitutional]; People v Lee, 58 NY2d 491 [1983] [finding village ordinance prohibiting possession of open or unsealed container of alcoholic beverage in public place unconstitutional].) Here, the challenged provisions of the Administrative Code violate the Commerce Clause on their face, and no set of facts has been presented which justifies the preferential treatment to in-State property. Thus, this is one of those rare occasions in which it is appropriate to strike the ordinances.

. Thus, for example, if the property has a value of $1,400,000, with a useful life of 10 years and a salvage value of $200,000, the taxpayer first deducts the $200,000 salvage value from the value of the property. Each year *676 of the property’s 10-year useful life, the taxpayer deducts $120,000, or one tenth of the remaining value of the property, from its income. At the end of two years, therefore, the taxpayer will have deducted $240,000 from its taxes.

. Therefore, considering the same property, the full $1,400,000 can be considered in computing the deductions. Furthermore, the first year, the taxpayer can deduct $280,000 from its income, two times the $140,000 it could deduct from $1,400,000 under the straight-line method. The following year, the taxpayer can deduct $224,000, which constitutes 20% of $1,120,000, the balance remaining after its first year’s deduction. At the end of two years the taxpayer will have deducted a total of $504,000 from its taxes. Once the taxpayer has deducted $1,200,000, it has deducted up to the reasonable salvage value and must stop taking depreciation deductions.

. Going back to the original example, and using the timetable in 26 USC § 168 (e) (1), the taxpayer can deduct the full $1,400,000. In addition, it can treat property having a 10-year useful life as seven-year property. Thus, in the first year the taxpayer can deduct $400,000, which is twice $200,000 (one seventh of the $1,400,000 deductible under this scheme). The second year the taxpayer can deduct two times one seventh of $1,000,000 which allows it a deduction of $285,714.28. After two years, the taxpayer will have deducted $685,714.28 from its taxes.

. The court has not differentiated between the ACRS and the modified ACRS. The distinction is relevant to the New York City taxing scheme but not to the issue at hand.

. Recovery property is " 'tangible property of a character subject to the allowance for depreciation’ when 'used in a trade or business, or * * * held for the production of income’ (Simon v Commissioner of Internal Revenue, 68 F3d, supra, at 43.)

. This court notes that it has considered the Federal cases the City has cited and discussed at length in support of its argument (see generally, defendants’ brief, at 36-39), and find them distinguishable for the reasons stated by RJR. (See, plaintiff’s reply brief, at 21-23.)