[667 NYS2d 4]

R.J. Reynolds Tobacco Company, Respondent, v City of New York Department of Finance et al., Appellants.

First Department, December 9, 1997

## APPEARANCES OF COUNSEL

*George P. Lynch* of counsel (*Edward F.X. Hart, Amy F. Nogid* and *Robert J. Firestone* on the brief; *Jeffrey D. Friedlander, Acting Corporation Counsel* of New York City, attorney), for appellants.

*Paul H. Frankel* of counsel (*Hollis L. Hyans, Irwin M. Slomka* and *Harry R. Jacobs* on the brief; *Morrison & Foerster, L. L. P.,* attorneys), for respondent.

## OPINION OF THE COURT

Tom, J.

The issue on appeal is whether a corporate taxing provision of the New York City Administrative Code that disallows a depreciation deduction for a corporation's property placed in service out of New York, while allowing such a deduction for property located within New York, confers preferential tax treatment upon local businesses, concomitantly discriminating against out-of-State property holders, so as to violate the Commerce Clause of the United States Constitution.

Plaintiff R.J. Reynolds Tobacco Company (RJR), a New Jersey corporation with its principal place of business in North Carolina, is engaged in the manufacture and sale of cigarettes in interstate commerce. Plaintiff purchases tobacco and other raw materials, arranges for the transport of such products to its manufacturing plants and then, upon manufacturing of the cigarettes, has them packaged, distributed and marketed. RJR's manufacturing facilities for the years in question were located primarily in Winston-Salem, North Carolina, and plaintiff's activities in New York consisted for the most part of distributing and marketing cigarettes. It is not controverted that plaintiff does business in New York and, as such, falls under New York City's taxing authority.

The distinction between "straight-line" depreciation and a "declining balance" depreciation for tax purposes is relevant in this case. Simply put, straight-line depreciation correlates with a pro rata depreciation over the useful life of the asset; the deduction is calculated by an equation that divides the asset's value, after a reduction for a postulated salvage value, by

its useful life. Each year's deduction is equal to every other year's deduction over the useful life of the asset. By contrast, for declining balance depreciation, deductions are shifted toward the early useful life of the asset, and proportionately reduced during the latter depreciable period. Although the tax basis for each mode of depreciation remains the same—cost—there is a financial difference that correlates with the manner in which the deductions are staggered: for declining balance or accelerated depreciation, the relative greater deductibility during the early years releases funds that otherwise would be earmarked for taxes, although this early benefit is offset by greater tax exposure toward the end of the asset's useful life.

Internal Revenue Code (IRC) (26 USC) §§ 167 and 168 both provide for a variety of tax deduction strategies, and each has limitations on the types of assets to which deductions may be applied, a point elaborated at length in the City's brief. While the provisions are different in the method of allowable deductibility concerning the different classes of assets, we restrict our analysis to the City's actual disallowance in reliance on IRC § 168 when this particular taxpayer filed its New York City franchise tax returns for the specific years in question. In relevant part, IRC § 167 allows a deduction on the Federal tax return for straight-line depreciation. Alternatively, if the asset had a useful life in excess of three years, then the declining value method may be used until salvage value is reached. A ceiling is imposed on annual deductions in that the taxpayer is limited to twice the rate that would have been used had the straight-line method been used. IRC § 168 gives the taxpayer the alternative of utilizing straight-line depreciation or "accelerated" depreciation. But if "accelerated" depreciation is utilized, then there are additional benefits: the salvage value is zero; and when the annual deduction is reduced to the point where a straight-line depreciation would have yielded a better benefit, the taxpayer may switch to a straight-line method of depreciation. Additionally, the recovery period may be shorter than the useful life.

The City argues that these statutes have distinctions without any real difference in view of the various tax options in each.

The amendment of the Internal Revenue Code to allow for the accelerated depreciation of certain tangible, revenue-related, corporate assets, intended as a stimulus for economic growth, was a product of the Economic Recovery Tax Act of 1981 (Pub L 97-34, 95 US Stat 172). IRC § 168 was intended to provide taxpaying strategies to the taxpayer in excess of those

formerly provided under IRC § 167. The exercise of the option to accelerate deductions known as the Accelerated Cost Recovery System (ACRS) was intended to encourage economic expansion from investment of the released funds, and at the same time, to create potential investment-oriented benefit to the taxpayer.

The propriety of the depreciation deduction for Federal tax purposes, which is ably illustrated in the decision of the motion court (169 Misc 2d 674), is not in dispute. Local taxing authorities, although imposing their own tax rates, often generally track the corporation's Federal tax statements for income and deduction purposes. In the present case, New York City utilized RJR's statement of income on its Federal return, and generally allowed for its utilization of Federal deductions, except that it disallowed RJR's deduction of its IRC § 168 accelerated depreciation for property located outside of New York State.

New York City's general corporation tax is included in title 11 (ch 6, subch 2) of the Administrative Code. In relevant part, the Administrative Code provides that "every domestic or foreign corporation [that does business, employs capital, or owns or leases property in the City in a corporate or organized capacity] * * * shall annually pay a tax, upon the basis of its entire net income" (Administrative Code § 11-603 [1]). The corporate taxpayer is taxed on a portion of its entire net income (Administrative Code § 11-604 [1]), which generally equates with the corporation's Federal taxable income, subject to certain adjustments, including deductions (Administrative Code § 11-602 [8]). The Administrative Code creates a threshold date of 1981 for all corporate taxpayers, and 1984, for property "placed in service in New York," for purposes of the availability of the Federal accelerated depreciation deduction. Since the tax years in issue occurred after 1981, and the dispute does not focus on in-State property, neither of these dates operates with respect to plaintiff.

Under the challenged provisions, the corporate taxpayer may not exclude from its entire net income for New York City taxing purposes "the amount allowable as a deduction * * * under [IRC § 168]," unless the depreciated property had been "placed in service" in New York State after 1984 (Administrative Code § 11-602 [8] [b] [11]). However, the taxpayer could take a deduction for property for which the corporate taxpayer was entitled to a deduction under IRC § 167 (Administrative Code § 11-602 [8] [j]), which latter deduction is then excluded

from entire net income (Administrative Code § 11-602 [8] [a] [10]). As such, if the taxpayer had taken the IRC § 168 accelerated depreciation deduction on the Federal tax return, but the property happened to have been placed in service outside of New York State, this amount then would have to be added back on to the Federal taxable income to calculate the entire net income, from which an IRC § 167 deduction might then be taken, as the basis for the assessment of corporate taxation in New York City.

For tax years 1987 and 1988, plaintiff timely filed tax returns required under the New York City general corporation tax (*id.*), utilizing the accelerated depreciation deduction allowable under IRC § 168, without distinguishing between its property "placed in service" within, and without, New York State. Plaintiff's out-of-State property, for which it claimed depreciation deductions under Federal tax law, included office furniture and fixtures, computer equipment and software, research and other equipment, manufacturing plants, machinery, trucks and other vehicles, and additional operating assets.

When the New York City Department of Finance audited these returns, it issued a notice of determination finding a tax deficiency relating to the extent of the deduction taken under IRC § 168 for plaintiff's out-of-State property. That the result of the audit is consistent with the provisions of the Administrative Code presently under challenge is not disputed, placing the constitutionality of those provisions squarely in issue. Although the original September 29, 1993 determination of a deficiency of $281,970.70 (including $168,156 in back taxes, $96,999.10 in interest and $16,815.60 in penalties) was reduced to $105,064 (with penalties and interest deleted) by the Department of Finance's Conciliations Bureau after its February 22, 1994 conciliation conference, plaintiff contends that the legality of the Administrative Code provision, rather than the Department's accounting, is in issue.

The motion court, in granting summary judgment in this CPLR article 78 proceeding, declared these provisions of the Administrative Code unconstitutional under the Commerce Clause, declared the notice of determination void and permanently enjoined the City from enforcing the notice as well as the subject Administrative Code provisions. The motion court found that these provisions facially discriminated against interstate commerce and had a protectionist intent as well as effect. The court noted that a practical effect of the challenged provisions is to disallow an otherwise Federally allowable ac-

celerated depreciation deduction to a corporation for property that happens to have been placed in service outside of New York State (169 Misc 2d 674, 678, *supra*). The motion court further found a practical incentive for companies to move their depreciable assets to New York, and a corresponding disincentive for them to keep such revenue-producing, and commerce-related, property and affiliated services in any other State.

Defendants argue on appeal that the challenged statute does not impose a burden on interstate commerce and that such a burden, if found to exist, cannot be considered discriminatory under applicable law.

Generally, in order to survive a taxpayer's challenge, the State tax must be applied to an activity with a substantial nexus with the taxing State; it must be fairly apportioned; it must not discriminate against interstate commerce; and it must be fairly related to the services provided by the State (*Amerada Hess Corp. v Director, Div. of Taxation*, 490 US 66 [1989]). Only the impact on interstate commerce is raised in this case. Although the plaintiff initially bears the heavy burden of rebutting the presumption of constitutionality that applies to municipal ordinances (*Lighthouse Shores v Town of Islip*, 41 NY2d 7, 11), once the ordinance can be shown to have a discriminatory effect on interstate commerce, the burden switches to the municipality to justify the ordinance constitutionally (*Farmland Dairies v McGuire*, 789 F Supp 1243, 1250-1251).

The United States Constitution, in the Commerce Clause, confers on Congress the exclusive power to "regulate Commerce * * * among the several States" (US Const, art I, § 8, cl [3]), which in its "negative" or "dormant" aspect, implicitly deprives the States of the power to interfere with interstate commerce (*Boston Stock Exch. v State Tax Commn.*, 429 US 318, 328 [1977]) and "embodies a negative command forbidding the States to discriminate against interstate trade" (*Associated Indus. v Lohman*, 511 US 641, 646; *accord, Oregon Waste Sys. v Department of Envtl. Quality*, 511 US 93, 98). "Discrimination" in this context alludes to State-centered economic protectionism (*Associated Indus. v Lohman, supra*; *Fulton Corp. v Faulkner*, 516 US 325 [1996]) or "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" (*Oregon Waste Sys. v Department of Envtl. Quality, supra,* at 99; *American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin.*, 84 NY2d 31, 34-35, *rearg denied* 84 NY2d 838).

Although originally intended to prohibit internal tariffs (*West Lynn Creamery v Healy*, 512 US 186 [1994]), and historically understood to prohibit State restrictions on goods and services in commerce, the Commerce Clause has been given significant additional expansion by the Supreme Court in recent decades to include regulations imposed on out-of-State businesses as a subterfuge for protectionism (*Associated Indus. v Lohman*, 511 US 641, *supra; Oregon Waste Sys. v Department of Envtl. Quality, supra*), and taxation burdening out-of-State businesses (*Chemical Waste Mgt. v Hunt*, 504 US 334, 342 [1992]; *Boston Stock Exch. v State Tax Commn., supra,* at 332, n 12; *Fulton Corp. v Faulkner, supra*) as a subterfuge for internal tariffs (*West Lynn Creamery v Healy, supra*; *Bacchus Imports v Dias*, 468 US 263 [1984]). Supreme Court jurisprudence makes no distinction for purposes of the Commerce Clause between a tax on actual income producing activity and a tax only incidentally impacting on a business's interstate commercial activities (*Camps Newfound/ Owatonna v Harrison*, 520 US —, 117 S Ct 1590 [1997]), such as ownership of property used in connection with the commercial activity for which the tax is imposed.

Specifically with respect to taxation, out-of-State businesses are not exempt under the Commerce Clause from State-imposed taxes solely because taxes increase the costs of doing business that happens to be interstate (*Complete Auto Tr. v Brady*, 430 US 274, 279 [1977]; *Western Live Stock v Bureau*, 303 US 250, 254 [1938]). The Commerce Clause was never intended to eclipse the reserved power of the States to impose taxes to pay for the support of State governments (*Gibbons v Ogden*, 9 Wheat [22 US] 1, 199 [1824]). Rather, the test is whether a tax burdens the out-of-State business more than it burdens local business, so that it discriminates against the out-of-State business in favor of the local business, providing a direct commercial advantage to local business (*Oregon Waste Sys. v Department of Envtl. Quality, supra,* at 99; *American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., supra*).

If the State action is facially discriminatory, then the putatively neutral purpose or justification of the law, or its de minimis effect (*see, Associated Indus. v Lohman, supra,* at 650 ["the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred"]), cannot serve to validate it absent a dual showing that the law advances a legitimate local purpose and that such

cannot be served by reasonable nondiscriminatory alternatives (*Oregon Waste Sys. v Department of Envtl. Quality, supra,* at 100-101).

The taxing ordinance in the case at bar is not an "even-handed" regulation (*see, Pike v Bruce Church,* 397 US 137, 142; *Oregon Waste Sys. v Department of Envtl. Quality, supra* at 99) that can be deemed tax neutral (*see, Boston Stock Exch. v State Tax Commn., supra,* at 331-332). Rather, it is facially discriminatory, a circumstance that imposes on the City the burden (*Farmland Dairies v McGuire,* 789 F Supp 1243, 1250-1251, *supra*) of demonstrating that there is no other method to advance a legitimate local interest (*C & A Carbone v Clarkstown,* 511 US 383, 392) unrelated to economic protectionism (*Fort Gratiot Sanitary Landfill v Michigan Dept. of Natural Resources,* 504 US 353, 359). Notably, the City here fails to articulate what constitutionally legitimate local interest is being served. The ordinance in question has the practical effect of discriminating against taxpayers doing business in New York City who have commercial property located outside of New York. The unequal treatment of the taxpayers "results solely from the situs of their activities and provides a commercial advantage to local businesses" (*American Tel. & Tel. Co. v New York State Dept. of Taxation & Fin., supra,* at 35) and threatens to exert "an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States'" (*American Trucking Assns. v Scheiner,* 483 US 266, 286-287).

The City's argument that there is a distinction, for Commerce Clause purposes, between overt differences in tax rates, and a mere disallowance of a mode of deduction for out-of-State property, elevates form over substance. Similar reasoning has been rejected when a taxing authority sought to distinguish differential tax effects resulting from allowing, or disallowing, tax credits in connection with New York-based activity (*cf., Westinghouse Elec. Corp. v Tully,* 466 US 388, 404) and when a tax exemption was allowed to specified goods produced in State (*Bacchus Imports v Dias, supra*). Under analogous circumstances, where the State imposed an "intangibles tax" on the market value of corporate stock owned by State residents but allowed a deduction equal to the fraction of the issuing corporation's income in the State, the practical effect was to tax out-of-State businesses on value of shares and in-State residents on value as reduced by the income tax (*Fulton Corp. v Faulkner, supra*). The United States Supreme Court

found that such a taxing scheme actually imposed a heightened tax burden in proportion to a business's participation in interstate commerce. That clear violation of the Commerce Clause parallels the practical effect of the ordinance currently under review: "the taxes are * * * different (quite apart from stated rates)" (*supra*, at 340).

More specifically, the ACRS presently in contention effectively rewards the in-State business by postponing the full weight of the tax, allowing today's use of the increased funds released by the delayed taxation and utilizing a zero salvage value. Further, at the point where deductions would continue to decline until the straight-line method would yield a greater benefit, section 168 provides an election for the taxpayer to then utilize straight-line accounting. The ACRS scheme specifically is devised to offer qualifying taxpayers "the advantage of deferring the payment of income taxes from early in a plant's asset life until later * * *. This results in smaller amounts of taxable income and income taxes paid in the early years" (Larson and Miller, Fundamental Accounting Principles, at 546 [1993]). The City argues that the basis for either method of depreciation—the cost of the asset—is the same, so that there is no net difference in costs. The City also argues that the aggregate long-term effect of choosing either form of deduction—straight-line or accelerated—is the same, and that the only difference arises from the annualized skewing of deductions under IRC § 168. However, there is a significant difference year by year, and especially for the years for which the audit was conducted in this case, as well as potential differences in the aggregate. Even the City's own argument fails to account for the relative difference in the availability of funds under the different depreciation methods. The greater utility of these funds, which can be invested presently rather than paid out in near-term taxes, is an inducement, even if only a modest one, for a business to invest in New York property. Conversely, this scheme provides a disincentive to invest a New York business's resources in property out of State.

In Justice Cardozo's words, the paramount consideration is: "[w]hen the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed" (*Henneford v Silas Mason Co.*, 300 US 577, 584 [1937]). Here, RJR has been given a commercial disincentive in the amount of $105,064 directly related to the location of the depreciated assets.

The City contends that the similarities between IRC §§ 167 and 168 in terms of the modes of depreciation undermine any discriminatory effect. However, we agree with the nisi prius court that such an ostensible similarity of treatment is specious: the in-State taxpayer may opt for either taxing methodology, depending on its own assessment of its self-interests, whereas RJR in this case, owning property placed in service out of State, has no election.

Similar reasoning led to invalidation of an ACRS taxing scheme in *Beatrice Cheese v Wisconsin Dept. of Revenue* (1993 Wis Tax LEXIS 5, 1993 WL 57202 [Wis Tax App Commn, Feb. 24, 1993]). There, too, the taxing statute specifically disallowed accelerated depreciation deductions for property located outside of Wisconsin, but allowed the more generous ACRS treatment for property located within the State. That court found the effect was "to impose a higher franchise tax burden on a business solely because some or all of its depreciable property is located outside rather than inside [the State, which] is clearly facial discrimination against interstate commerce" (1993 Wis Tax LEXIS 5, 7, 1993 WL 57202, 3). While we note the City's acknowledgement of the "contextual similarities" between *Beatrice Cheese* and the present case, we reject the City's asserted distinctions based on the putative dichotomy between the Wisconsin statute, which applies to property "located" in Wisconsin, and the Administrative Code, which treats property differently if "placed in service" in New York.

The City argues that case law invalidating other tax schemes turned on the required situs of the property—that it be located in the taxing State. The distinction made by the City between "located" in New York and merely "placed in service" in New York is one of semantics. It essentially is conclusory and again elevates form over substance. The City, noting that the phrase is not defined in the Administrative Code, refers to the accepted use of the term in Federal tax law to argue that "placed in service" is an accepted tax term rather than a pretextual term to avoid articulating a location-based standard. However, the term "placed in service" under Federal law connotes a temporal meaning with reference to a particular tax year (i.e., tax consequences flow from the year in which the asset is "placed in service"), whereas the Commerce Clause analysis is geopolitical, so that the analogy with Federal tax law does not hold. Moreover, although Federal tax law uses a term "placed in service," the challenged City tax ordinance requires that the asset be "placed in service in New York," a critical distinc-

tion that returns the phrase to the Commerce Clause analysis. Further, the City's suggestion that the temporal utility of the term is explainable and supports the nondiscriminatory effect of the ordinance (i.e., that this City taxing policy encourages the purchase of the depreciable property in New York but does not require its continued location there), ostensibly avoiding an interstate commerce violation, is without merit in view of the nature of certain of the depreciable assets in this case. In any event, if the City's point is that assets may still enjoy the more flexible tax treatment in dispute even if they are removed from New York, so long as they were purchased here or otherwise placed in service here, the practical effect is to encourage an out-of-State company to engage in economic activity in New York, possibly submitting to the additional tax exposure as a consequence of doing more business in New York, in order to qualify for the deduction. No matter how the differential depreciation is explained, it impermissibly imposes on a business's interstate commercial decisions.

We have considered the City's remaining contentions and find them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (Louis York, J.), entered April 1, 1996, granting plaintiff's motion for summary judgment (CPLR 3212; 22 NYCRR 606.2 [a]) to the extent of declaring unconstitutional Administrative Code of the City of New York § 11-602 (8) (a) (10); (j); and (b) (11), and declaring that the notice of determination is null and void, should be affirmed, without costs.

MILONAS, J. P., RUBIN, ANDRIAS and COLABELLA, JJ., concur.

Judgment, Supreme Court, New York County, entered April 1, 1996, affirmed, without costs.